**Patricia A. BROOKS and First Interstate Bank, N.A., Casper, Co–Trustees of the Brooks Marital Trust, Appellants (Plaintiffs),**

v.

**John A. ZEBRE, d/b/a John A. Zebre, P.C., a Wyoming Corporation, Appellee (Defendant).**

**No. 88–263.**

Supreme Court of Wyoming.

May 17, 1990.

Wesley A. Roberts and Donald P. White of White, White & Keenan, P.C., Riverton, for appellants.

W.W. Reeves of Reeves & Murdock, Casper, for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT, and MACY, JJ., and ROONEY, J., Retired.

THOMAS, Justice.

In this case, we address the question of whether John A. Zebre, a practicing attorney d/b/a John A. Zebre, P.C. (Zebre), owed a duty to Patricia A. Brooks (Brooks) and First Interstate Bank, N.A., Casper (Bank), the co-trustees of the Brooks marital trust, who were not clients of Zebre. The claims against Zebre had their genesis in his representation of members of the Arambel family in connection with a contract to lease, and an option to purchase, a ranch. Zebre's clients were the lessees and optionees under the contract. The claims against Zebre are asserted by Brooks and the Bank, with Brooks being the lessor and grantor of the option under the contract while acting as the personal representative of the estate of her deceased husband. After the contract was rescinded by the court because it was found to be unconscionable, Brooks and the Bank sought damages from Zebre. In the assertion of the claim for damages, theories of negligence, gross negligence, and fraud were pleaded. The district court granted a summary judgment to Zebre on the ground that no duty was owed by Zebre to Brooks that would permit recovery under the theories of negligence or gross negligence and on the ground that there was no fraud demonstrated on the record. We affirm the grant of summary judgment by the district court.

In the Appellants' Brief, Brooks and the Bank submit the following statement of issues:

"1. Does an attorney owe a duty to a non-client who he knows to be represented by an attorney when he undertakes to conduct negotiations, advises both parties as to the legal consequences of the transaction, and presides over the execution and closing of the transaction?

"2. Is there a genuine issue as to any material fact so as to preclude Summary Judgment as a matter of law in this case?

"3. Assuming, arguendo, that there exists no genuine issue as to any material fact, could reasonable minds reach different conclusions from those undisputed facts on the issues of negligence, gross negligence and fraud so as to preclude Summary Judgment as a matter of law?"

Those issues then are afforded additional substance by the Summary of Argument, which we quote:

"I. Zebre owed a duty to the Brooks estate, and the heirs thereof, in connection with the lease and option to sell the Brooks Ranch, notwithstanding the absence of privity between them, because;

"A. The ethical duty imposed on attorneys in Wyoming by the Code of Professional Responsibility creates a legal duty and a legal standard of care.

"B. Zebre was not only acting as an attorney, but was performing functions of a real estate agent or broker in closing the Brooks Ranch transaction and should be held to at least that legal standard of care imposed upon the real estate profession.

"C. Zebre's conduct, when considered under the 'balancing of factors' test established in recent court decisions, clearly gives rise to an independent duty of care to the Brooks estate and the heirs thereof.

"D. Once Zebre spoke to the issue of imputed interest, he thereafter had a duty to make a full and fair disclosure thereof.

"II. The district court erred in granting summary judgment because there exist genuine issues as to material facts in this case.

"III. Assuming, arguendo, that there exist no genuine issues as to any material facts, the district court erred in granting summary judgment because reasonable minds could reach different conclusions and inferences from the undisputed facts on the issues of negligence, gross negligence and fraud on the part of Zebre."

In the Brief of Appellee, John A. Zebre, the issues are articulated in this fashion:

"1. Whether current theories which impose liability on an attorney for harm to non-clients resulting from the attorney's negligence in performing professional services for a client, can apply where the non-client had interests adverse to those of the attorney's client and where the legal services were performed to the client's satisfaction;

"2. Whether violation of ethical rules of conduct adopted by the Supreme Court creates a private right of action, where no right of action for the conduct complained of otherwise exists;

"3. Whether appellants have adequately plead and established in the evidence a viable claim of fraud;

"4. Whether appellants' claims of fraud have been conclusively adjudicated against it, that is, may appellants maintain an action against Mr. Zebre on the contention that he participated in his client's scheme to defraud, when appellants tried and lost the same fraud claims against the clients; and

"5. Whether having obtained the equitable remedy of rescission and restitution from Mr. Zebre's clients, appellants may now use the same facts to pursue a claim for the legal remedy of damages against the lawyer, Zebre."

In a Reply Brief of Appellants, the issues are not expanded, but the following Summary of Argument is submitted in response to points raised in the brief of the appellee:

"I. There is no issue of judicial estoppel in this case.

"II. Claims for fraud have never been litigated in this matter, and, therefore, appellants cannot be foreclosed from litigating those claims now.

"III. Appellants are entitled to recover damages that are a direct and proximate result of Mr. Zebre's tortious conduct."

This dispute centers upon the lease of a ranch in Sweetwater County that included an option to purchase. The ranch, a viable livestock raising enterprise, was developed by Isaac Brooks who died in the spring of 1983, leaving a substantial estate that included the ranch. Isaac Brooks's wife, Patricia, was appointed the personal representative of the estate, and she, of course, was among the heirs. In addition to his wife, Isaac Brooks was survived by their four natural children and a daughter of Mrs. Brooks whom Isaac had adopted. One son was in quite delicate health, having already had a colostomy and a brain shunt at a relatively early age.

About two months after Isaac Brooks's death, members of the Arambel family, neighbors and long-time friends, began a series of almost daily visits with Mrs. Brooks. In the course of these visits, she expressed an interest in leasing the ranch.

She also manifested an overriding concern for the future of her ill son. The record demonstrates that the additional duties required of her as personal representative, which included management of the ranch, when added to her usual responsibilities as the mother of five young children, created an extremely difficult burden for Brooks, who had not received much formal education and had little business experience. She exhibited indications of stress including drinking as much as a case of beer per day.

Not long after she expressed an interest in leasing the ranch, the Arambels arranged a meeting with Brooks in the law offices of Zebre for the purpose of discussing and arranging a possible lease. Zebre was acquainted with Brooks, and the record discloses he visited in her home during Isaac Brooks's last illness. At that time, he reviewed Isaac Brooks's will, in her presence, and offered some suggestions as to improvement of the dispositive scheme. Despite this earlier acquaintance, however, and despite whatever knowledge Zebre possessed of the Isaac Brooks will and estate, there is no question on the part of any party that Zebre represented only the Arambels.

At the meeting in Zebre's office, Brooks advised him that another attorney was handling the probate of the estate of her deceased husband, and she suggested to all who were present that the estate attorney be involved in the negotiations. Later, she testified that, in response to this suggestion, John Arambel told her, "[y]ou don't need to talk to [the attorney] because he won't let you do it because he wants all the money." She further testified that Zebre said to her, "[d]on't tell [the attorney] because he'll just tell you not to lease that ranch." Zebre claims to have made several attempts to contact the attorney for the Brooks estate, but the record does not demonstrate that any contact ever was made or that the estate attorney was informed of these matters until after all negotiations had been completed and the agreement had been executed. The meeting at which the contract provisions were agreed upon was conducted with neither Brooks, nor her children, nor the estate being represented by an attorney or any other person knowledgeable in either business or law.

This meeting, which lasted about an hour, is exemplified only by reports of the conversation. No records were kept, and no documents were reviewed, discussed, or created. The parties testified that Mike Zebre, Zebre's brother, was summoned to the meeting at one point to explain the tax consequences of the imputation of interest by the Internal Revenue Service with respect to periodic payments that did not include an interest factor. Brooks asked no questions of Mike Zebre although he admitted in his deposition that he, in fact, did give her advice.

Brooks's testimony with respect to this meeting was that she was not able to comprehend much of the discussion. Her recollections of the meeting, and the discussion relating to the lease and the option, were extremely vague. She testified that she did not remember any conversation concerning an option to purchase the ranch, a forty-year lease, a sale of all the cattle and sheep, or other essential terms and conditions of the agreement finally reached. Zebre recalls, on the other hand, that Brooks was "very poised, confident" and that "she was very certain and very positive, confident about what she was there about, what was happening."

Following the meeting, Zebre prepared the contract encompassing the lease, the option, and the sale of livestock as well as the other aspects of the agreement reached at the meeting in his office. On the next day, Brooks and the Arambels again met at Zebre's office and proceeded to review, for the first and only time, the proposed contract, the drafting of which was attributable to the joint efforts of Zebre and the Arambels. Zebre asserts that he did attempt to reach the attorney for the Brooks estate at that time, but was unsuccessful. Even though he was unable to contact the other attorney, he returned to the conference room and presided over the execution of the agreement, assuring Brooks, all the while, that he was going to get in touch with the attorney for the estate the first

thing the following Monday morning to make sure that the attorney had appropriate copies of everything. Zebre did follow through, and he delivered a fully executed copy of the agreement to the attorney for the estate, demanding that the attorney seek court confirmation of the transaction because the property still was involved in the probate proceedings. Upon his review of the agreement, the attorney for the estate recommended to Brooks that she return any consideration she already had received and that she seek *rescission of the* contract. Brooks did not, at that time, follow through on that advice.

Subsequently, an action was instituted by the Arambels for a declaration of their rights under the agreement. Brooks and the estate counterclaimed for rescission of the contract, and they caused Zebre to be named as a "third-party defendant." The product of that action was that the court ruled that the agreement was unconscionable and ordered rescission and appropriate restitution. The claims against Zebre were not resolved at that time. Later, all parties agreed to a mutually satisfactory arrangement to settle the matter except for the claims against Zebre. Zebre then moved for, and was granted, a summary judgment by the court. This appeal is taken by Brooks and the Bank, claiming that the district court erred in granting summary judgment because Zebre, even though representing the Arambels, is responsible for damages on the tort theories of negligence, gross negligence, and fraud.

■ In order to recover for negligence or gross negligence, the plaintiff is required to demonstrate all necessary elements of the tort including the element of a legal duty owed by the defendant to the plaintiff. *Guinand v. Atlantic Richfield Company,* 485 F.2d 414 (10th Cir.1973); *Thomas by Thomas v. South Cheyenne Water and Sewer District,* 702 P.2d 1303 (Wyo.1985); *Hughes v. Housley,* 599 P.2d 1250 (Utah 1979). The issue of whether a duty is owed is strictly a question of law. *McClellan v. Tottenhoff,* 666 P.2d 408 (Wyo.1983); *Moewes v. Farmer's Insurance Group,* 641 P.2d 740 (Wyo.1982); *Dis-*

*tad v. Cubin,* 633 P.2d 167 (Wyo.1981); *Medlock v. Van Wagner,* 625 P.2d 207 (Wyo.1981); *Beard v. Brown,* 616 P.2d 726 (Wyo.1980); *Maxted v. Pacific Car and Foundry Company,* 527 P.2d 832 (Wyo. 1974). With respect to questions of law, we do not defer to the decision of the lower court. *Matter of North Laramie Land Company,* 605 P.2d 367 (Wyo.1980). When we determine, however, that no legal duty exists from a defendant to the plaintiff, a summary judgment with respect to claims of negligence is appropriate and must be affirmed. *See Fiscus v. Atlantic Richfield Company,* 773 P.2d 158 (Wyo.1989); *Matter of Larsen,* 770 P.2d 1089 (Wyo.1989); *Farr v. Link,* 746 P.2d 431 (Wyo.1987); *Johnson v. Soulis,* 542 P.2d 867 (Wyo. 1975).

■ From the record, it is indisputable that Zebre owed his professional duty to the Arambels. They were his clients, and an attorney assumes the very highest of duties with respect to zealous representation of his clients. *Sowerwine v. Nielson,* 671 P.2d 295 (Wyo.1983). Brooks's interests with respect to the transaction were adverse to those of the Arambels, and it is fundamental that Zebre could not have assumed a duty to Brooks without violating his primary duty to the Arambels. *Hughes.* The situation emphasizes scriptural wisdom. "No servant can serve two masters. For he will either hate the one and love the other, or he will cling to the one and despise the other." *Luke 16:13* (Richmond Lattimore Translation). In this instance, there is no suggestion of any dissatisfaction·by the Arambels with Zebre's services, nor do they claim that he was negligent in performing his duties to them or that he provided anything less than entirely exemplary service on their behalf.

*Brooks does not claim that Zebre was representing her or that he was negligent in performing his services for the Arambels.* Brooks and the Bank insist that Zebre was directly negligent in his treatment of Brooks as an adverse party. A specific allusion is made with respect to advice con-

cerning the imputed interest rules of the Internal Revenue Service.

Brooks and the Bank premise their contentions upon precedent from other jurisdictions. Having considered those asserted authorities carefully, we agree with the district court and hold that an attorney owes no actionable duty to an adverse party emanating from the zealous representation of his own client. *Friedman v. Dozorc*, 412 Mich. 1, 312 N.W.2d 585 (1981). *Cf. Chicago Title Insurance Company v. Holt*, 36 N.C.App. 284, 244 S.E.2d 177 (1978) (claims of attorney malpractice or negligence generally sound in contract law and not in tort). Any infringement upon this proposition, in our judgment, results in an irreconcilable conflict of interest working extreme violence to the adversarial process as we know it. *See Friedman*. Because it is undisputed in the record that Zebre was representing only the Arambels, Brooks and the Bank present no genuine issue of material fact germane to this rule. Consequently, the claims of negligence and gross negligence against Zebre must fail, as a matter of law, and the summary judgment as to those issues must be affirmed.

Cases which apparently have followed the balancing rule articulated in *Biakanja v. Irving*, 49 Cal.2d 647, 320 P.2d 16 (1958), are distinguishable because the facts in those instances assume a third-party beneficiary whom the client clearly intended to favor by employing the services of the attorney. Even so, not all jurisdictions have opted to follow the suggestion of *Biakanja. See, e.g., Simon v. Zipperstein*, 32 Ohio St.3d 74, 512 N.E.2d 636 (1987). The rule with respect to attorneys representing buyers of real property is that no duty is owed to a seller. *Fox v. Pollack*, 181 Cal. App.3d 954, 226 Cal.Rptr. 532 (1986); *Clause v. Manuel*, 442 So.2d 905 (La.App. 1983), *cert. denied* 448 So.2d 106 (La.1984). Cases from a number of jurisdictions invoking the rule of privity are cited in Annotation, *Attorney's Liability, to One Other Than Immediate Client, for Negligence in Connection with Legal Duties*, 61 A.L.R. 4th 615 (1988), § 8 at 634. In the same Annotation, § 9 at 645, authorities are cited establishing the proposition that no cause of action for negligence exists against an attorney for an adversary.

■ We turn then to the contention of Brooks and the Bank that they are entitled to a cause of action arising out of an asserted violation of the rules adopted by this court relating to ethical conduct of attorneys. The clear rule is that no private cause of action in favor of a non-client can be found attributable to violations of the disciplinary rules relating to attorneys. *Brody v. Ruby*, 267 N.W.2d 902 (Iowa 1978); *Hill v. Willmott*, 561 S.W.2d 331 (Ky.App.1978); *Spencer v. Burglass*, 337 So.2d 596 (La.App.1976), *cert. denied* 340 So.2d 990 (La.1977); *Friedman; Drago v. Buonagurio*, 46 N.Y.2d 778, 413 N.Y.S.2d 910, 386 N.E.2d 821 (1978). *Cf. Hawkins v. King County, Department of Rehabilitative Services, Division of Involuntary Treatment Services*, 24 Wash.App. 338, 602 P.2d 361 (1979) (duty of zealous representation of a client's interest overriding unsupported claim of ethical violation). We hold that no claim will lie on behalf of Brooks and the Bank founded upon any violation of the disciplinary rules relating to attorneys.

■ A contention also is present that Zebre was performing the functions of a real estate agent, or broker, and should be held to the legal standard of care imposed upon that profession. In our view, the only basis for liability against Zebre is his conduct in his professional role as an attorney, and the rules relating to the conduct of real estate brokers and agents have no pertinency here. While the record seems clear that Zebre, through his brother, did offer information with respect to the imputed interest rules of the IRS, we can discern no way in which that information would be material to this dispute in light of the fact that the transaction was rescinded. That advice, good or bad, could not have had any impact upon the rights of Brooks or the Bank.

■ In addition to the negligence claims, Brooks and the Bank claim that fraud was perpetrated on them by Zebre. This claim also is appropriately disposed of as a mat-

ter of law on summary judgment because Brooks and the Bank do not provide anything other than conclusive allegations to support their claim. Despite numerous contentions of wrongdoing, Brooks and the Bank are not able to establish on the record any actual misrepresentations or statements allegedly made by Zebre with knowledge that they were false and with the intent that Brooks should rely upon them. The omission is fatal in an instance such as this because our rule is that claims of fraud must be plead with particularity. Rule 9(b), W.R.C.P.; *Johnson v. Aetna Casualty & Surety Company of Hartford,* 608 P.2d 1299 (Wyo.1980), *cert. denied* 454 U.S. 1118, 102 S.Ct. 961, 71 L.Ed.2d 105 (1981), *reh. denied* 455 U.S. 1039, 102 S.Ct. 1743, 72 L.Ed.2d 157 (1982).

It well may have been more appropriate to dispose of this aspect of the case by granting a dismissal to Zebre. Nevertheless, in light of this record, we address it in the context of a summary judgment. While we are reluctant to decide a matter on anything other than the merits, we have recognized that the entire beneficial purpose of a summary judgment could be defeated if cases could be forced to unnecessary trial by the mere assertion that a genuine issue of material fact exists. *Fiscus,* 773 P.2d 158; *Noonan v. Texaco, Inc.,* 713 P.2d 160 (Wyo.1986); *Johnson; Maxted,* 527 P.2d 832. When the movant for summary judgment has made a *prima facie* showing entitling him to relief, as Zebre did in this case by demonstrating to the court that there were no specific allegations of fraud, the burden must shift to the party opposing the motion to present admissible evidence of material facts sufficient to refute the *prima facie* showing. *Connaghan v. Eighty–Eight Oil Company,* 750 P.2d 1321 (Wyo.1988). In this instance, without regard to the admissibility of the evidence presented, Brooks and the Bank have failed to assert any facts necessary to establish the elements justifying a cause of action for fraud. Consequently, the district court correctly granted summary judgment as to this claim as a matter of law.

Since the record, and the law, establish that no legal duty flowed from Zebre to Brooks in this instance, the claims for recovery for negligence and gross negligence must fail. Furthermore, in the absence of any evidence of fraud, the claim of Brooks and the Bank to recover for fraud must fail. We affirm the summary judgment entered by the trial court in Zebre's favor.

URBIGKIT, J., files a dissenting opinion.

URBIGKIT, Justice, dissenting.

I regretfully but strongly dissent. The result of this holding permits predation by an attorney so long as the defrauded victim is not a client. I am unconvinced by the majority's rationale that any other result would do "extreme violence to the adversarial process." This fraud did not occur within the context of an adversarial process and I find such an explanation misplaced. It is non-adversarial if only one attorney directs the events. *Flaherty v. Weinberg,* 303 Md. 116, 492 A.2d 618 (1985).

John Arambel appeared to be close friends of Isaac and Patricia Brooks. The Arambels and the Brooks were neighboring ranchers. When Isaac Brooks died, John Arambel and his son Peter found use for John Zebre and his license to practice law. The three joined together and quickly convinced the recently widowed Patricia Brooks to sign an agreement after repeatedly advising her not to consult her attorney before she signed. Whether disoriented by grief or blinded by the trust of old friends during a time of enormous personal pain and anxiety, Patricia Brooks signed an agreement she should never have signed. That agreement essentially gave away the ranch.

In short order, the Arambels scurried to district court for a declaration of their rights against Patricia Brooks under that agreement. Patricia Brooks and First Interstate Bank, N.A., Casper, Wyoming counterclaimed to rescind the contract and named Zebre as a third-party defendant for damages from gross negligence and fraud. The district court judge granted summary

judgment to Zebre but rescinded the agreement as wholly unconscionable and issued a scathing twenty-three page decision letter. For purposes of summary judgment, it is assumed that Zebre willfully violated fundamental rules of professional conduct adopted by the Wyoming Supreme Court. Today, this court holds that Zebre owed absolutely no duty to Patricia Brooks and that she did not plead her complaint of fraud with sufficient particularity.[1]

The rationale which underpins this holding is that to permit "any infringement" on the proposition that an attorney owes no actionable duty to an adverse party would work an "extreme violence to the adversarial process." The solution here is mismatched with the rationale because this case does not involve the adversarial process. If protecting the adversarial process was at stake, I would join readily with the majority.

I cannot accept the majority's rationale that: (1) the duty to zealously represent a client frees an attorney from any actionable duty to others; (2) willfully violating the rule for professional responsibility by negotiating directly with another attorney's client, to the detriment of that client, creates no cause of action for the harmed individual; and (3) Brooks did not "assert any facts necessary to establish the ele-

ments justifying a cause of action for fraud." Giving all reasonable inferences to the non-moving party when reviewing a grant of summary judgment, it is not unreasonable to infer that fraud permeated the entire transaction. A newly widowed woman and her children were cheated out of their inheritance when Zebre, an attorney, succeeded in convincing her to rely on his advice and to not consult the attorney for her husband's estate before signing what was later declared an unconscionable agreement.[2]

## I.

## BACKGROUND

After rescinding the unconscionable contract, the pertinent portion of the district court judge's twenty-three page decision letter stated:

Let us consider, as briefly as possible, the facts. Pat Brooks, the personal representative, is the widow of Isaac N. Brooks who, having been in ill health since 1978, suffering from a heart condition, diabetes, high blood pressure, prostate trouble, and had been bedfast for a year, during which time his wife took care of him. He ultimately died on March 29, 1983. He was survived by his

---

1. The travail of the Brooks estate did not end with entry of the June 21, 1985 judgment requiring reconveyance because the judgment provided for management payments to the Arambels including a reasonable fee for management during the litigative period from execution of the sales agreement to litigation conclusion. The Arambels' accountant detailed ownership of a number of ranching operations, and submitted a billing for management of this family ranch of $12,000 a month, $5,000 for John, $5,000 for Peter, and $2,000 for Mary Arambel for the period to total somehow $216,000 plus another item, 1985 management and selling commissions of $108,000 to total $324,000 for the family ranch for less than two years. The original total claimed for expenses of ranch operation, part of which was interest on the initial down payment of $50,000, was $808,286 which was apparently settled out for $440,000 cash payment. Never let it be said that fraud does not necessarily pay. At the time that these individuals were billing $12,000 a month for ranch management, their other business entities included Midland Livestock Company, Dunten Sheep Company, Grey's River Livestock Compa-

ny, Circle L Cattle Company and the Brooks Ranch, which was operated as a partnership under the name of Pretty Water Livestock Company. In addition, Peter Arambel, at some time, also had a separate ranching operation.

2. The only mitigating factor in this course of events was that when the estate's attorney was advised that the estate property had been sold out from under him, the attorney was unable to convince the defrauded person to take action *at that time*. Where the Wyoming State Bar in its disciplinary obligations and procedures was during this entire course of events is not disclosed. As a matter of judicial fact and notice, serious reprimand, or possibly disbarment, should have occurred but did not. Whether complaint was made and why appropriate action was not taken are questions to which answers are not provided.

The seriousness of an attorney's conduct when negotiating an unsupportable deal directly with another attorney's client is surely not unknown to the Wyoming State Bar grievance organization.

wife, four natural children, and his wife's daughter whom he had adopted. At the time of his death he was the owner of a sheep and cattle ranch, some city real estate and personal property. Mrs. Brooks' son, Richard Goetacher died suddenly in 1981. Her son, Isaac Brooks, Jr., then 13 and 14 when the contract was signed, and probably still 14 on the date of the trial, was and is in poor health, having undergone thirteen operations, including a colostomy and a brain shunt. After Mr. Brooks' death, his wife had thrust upon her the duty of running a fairly large livestock company, aided by a manager who had worked for Mr. Brooks for 43 years. In addition, she still had five children, ranging in age from 10 to 17, and attempting to manage the city property along with the other assets of the estate ranging from corporate stocks, bank accounts, motor vehicles and her home. Her educational background was sparse, having quit high school in the 10th grade, and her business background even more meager as all she ever worked at was packing frozen dinners and as a waitress which she was when she married Mr. Brooks who was about 25 years her senior. She was not involved in the operation of the business, as that was handled by Mr. Brooks, nor involved in the bookkeeping or the preparation of tax returns. Sometime after her husband's death, she began drinking about a case of beer a day.

John and Peter Arambel, on the other hand, have been in the livestock business all of their lives. John is a high school graduate, a bank director for 25 years, has served on the Bridger Teton Advisory Board for about six years, counselor/agent for the French government, served as an FHA Livestock Inspector covering five Wyoming counties for five years, has been an ASC, has served on the FHA Loan Board, and was a director of the BLM for sixteen years, has reviewed government policies with regard to public lands and a member of the ASGA, which is similar to the FHA. He has been involved in the sale of at least ten ranches as a dealer, and is the owner with his sons of at least five livestock companies. He testified he was a lifelong friend of Mr. Brooks, who was the closest friend he ever had, and he knew that Mrs. Brooks had confidence in him.

Peter Arambel is a high school graduate, has attended Colorado State University for 3½ years, majoring in Pre–Veterinary Medicine, Natural Science and Agricultural Business, and has been in the livestock business since his school days.

After Mr. Brooks died, John Arambel attended the funeral, and then on July 24, 1983, paid her a courtesy call at which time he apparently learned that she was contemplating a sale of the Brooks ranch to the Rock Springs Grazing Association. This disturbed him because, as I gather from the testimony, he was afraid the RSGA would deny him access to some of his own holdings to his detriment. He asked her what she wanted for the ranch and she told him Mr. Brooks said it was worth 4½ million dollars, and that is what she wanted. He said he could not pay that, but he would talk to his sons. Then on August 1, 1983, he told her he wanted the ranch and on August 2, 1983, he and Peter discussed with her alone the terms. He testified he was aware of Isaac Brooks, Jr.'s physical condition; that he knew of the Brooks' special concern for Isaac Brooks, Jr. and of his physical condition; and he testified he made no allowances for the fact that Mrs. Brooks was recently widowed and had no real business experience. John Arambel also testified that he and Peter arranged a 40–52 year pay period but knew Mrs. Brooks was thinking of a cash sale. He also testified that he developed the $2,000.00 per A.U.M. figure but never discussed it with her; that he told her that Isaac, Jr. would be a partner with the Arambels and in his deposition he proposed Isaac, Jr. would become an immediate partner on an equal basis; that he had told Isaac Brooks, Sr. that he would take care of young Isaac; and he further testified that what he told Mrs. Brooks really meant nothing—it was only what the contract said that mattered.

Peter Arambel testified he and his father John told Mrs. Brooks it had to be a long term deal; and that they discussed the deal with her; and also they talked about splitting costs with Issac, Jr. as partners; and that Mrs. Brooks was concerned about Issac, Jr.[ ]

After the meetings with Mrs. Brooks, and after a lapse of about nine days, things moved with uncommon swiftness. John Arambel called John Zebre at 6:00 A.M. on August 11, 1983, and Zebre met with John and Peter at 1:00 P.M.[ ] Shortly thereafter, Mrs. Brooks and her daughter Kathy, then age 14, appeared at Zebre's office and there was discussion about the terms of the lease which was to be a long term, and apparently about the contract also. Mrs. Brooks was adamant about young Isaac's position but when discussion ended, his position was unclear. The Arambels and Zebre all testified, in one way or another, that Mrs. Brooks appeared poised and confident, and not intoxicated, depressed or confused. Since the contract called for no interest, Mike Zebre explained "imputed interest" to the parties. He did not explain in dollar figures the tax consequences of such imputed interest to any of the parties. The Arambels and John Zebre said Mrs. Brooks said she didn't believe in interest and "Screw the IRS and I'll get around this" or words to that effect. John Zebre also testified that Issac, Jr. would become a partner if he exercised his option at age 19 or within three years thereafter, to run his retained 500 A.U.M.'s in common with the Arambels, or upon such areas as they might designate. Although Mrs. Brooks testified John Arambel and John Zebre told her not to talk to her attorney, Galen West, as he would tell her not to lease the ranch, they both denied that. Further, Mrs. Brooks testified that no discussion was had of a sale, long term lease, option, interest, disposition of 500 A.U.M.'s, but the Arambels and Zebre all testified to the contrary.

The next day, on August 12, 1983, John Arambel again called John Zebre at 6:00 A.M. and asked him to meet the Arambels at their accountant's office at 7:00 A.M., which he did. Mrs. Brooks was not there, nor was she invited. Peter Arambel showed Zebre part of the deal which reserved 500 A.U.M.'s to Isaac, Jr. which permitted him to run his livestock to that extent in common with the Arambels, or upon such area as they might designate, if he exercised his option to do so when he reached age 19 or within three years thereafter, and that Isaac, Jr. would become a partner with the Arambels when he exercised the option. John Zebre went to his office to prepare the agreement and thereafter, about 4:00 P.M. according to Zebre, the Arambels arrived at his office, followed shortly by Mrs. Brooks and then Saima McCurtain, one of the trustees with Mrs. Brooks. Although the testimony is conflicting as to when everyone arrived at Zebre's office on the 12th, it is evident they did eventually. Also, there is conflicting testimony as to what further discussion was had concerning the contract, I have little doubt that the essential portions were read to the parties. Although Zebre had tried to call West on both the 11th and 12th, knowing he was Mrs. Brooks' attorney, he permitted her to sign the contract without letting her have her attorney examine it first, or even advising her to see her attorney. She never saw the contract before the 12th. The contract, by the way, was actually prepared by the Arambels by piecing together portions of contracts prepared by their former attorney before his retirement, with the addition of a few portions they developed themselves, and Zebre merely put it in the finished form. Zebre further testified that the Arambels had wanted the entire matter completed on the 11th, and said that Mrs. Brooks wanted it done also, but did not say when. John Arambel was then "insistent" that it be done as soon as possible. It is to be noted that throughout her entire testimony, Mrs. Brooks always referred to the contract as the "lease." The contract was signed and Mrs. Brooks was given a check for $50,000.00 dollars.

The district court then discussed the contract and what was wrong with it in sixteen numbered paragraphs [3] of which paragraph 12 stated:

Mrs. Brooks had no professional advice of any kind. She discussed the matter with her children, her brother, Mrs. McCurtain and Mr. Smith. None of them knew any more than she did about the legal effects of the contract. Mr. Smith knew the manual aspect of operating a ranch, but nothing of the legal aspects.

A settlement between the Arambels and the Brooks estate resulted in a significant depletion of the estate. Only claims against Zebre remain in this appeal.

## II.

### STANDARD OF REVIEW

Because the district court judge rescinded the contract and granted summary judgment for Zebre regarding the claims against him, we are left in this review with events which are established, events which are contested, and pleadings. Under the standard of review for summary judgment, all reasonable inferences are to be given the non-moving party, which in this case is Patricia Brooks and the bank. *Davenport v. Epperly,* 744 P.2d 1110 (Wyo.1987); *Cordova v. Gosar,* 719 P.2d 625 (Wyo.1986). If the decision is authenticated under W.R. C.P. 12(b)(6), a separate principle of any arguable allegation is invoked.[4] *Fiscus v. Atlantic Richfield Co.,* 742 P.2d 198, 202 (Wyo.1987); *Torrey v. Twiford,* 713 P.2d 1160 (Wyo.1986). *See also Riggs Nat. Bank of Washington, D.C. v. Freeman,* 682 F.Supp. 519 (S.D.Fla.1988), where a motion to dismiss was improvidently granted in a suit by the lender against the attorney without any attorney-client relationship by holding in disregard of a special confidence which the attorney had created.

This record presents an unconscionable contract negotiated by the attorney for the buyer in the absence of the attorney for the estate—to have been accomplished after Patricia Brooks, the personal representative/co-trustee to the estate, relied upon Zebre's advice to ignore her own attorney. The transaction resulted in significant dam-

---

**3.** This sales agreement and the sixteen point response by the district court judge is attached as Appendix "A" and Appendix "B".

Patricia Brooks, co-trustee and heir, thought the sale price was about $4.5 million. Actually, the agreement allowed a $50,000 down payment and no interest to acquire livestock over *ten years* and what was in reality an open option of at least forty years to purchase the ranch property for $3.5 million with rental payments credited to purchase. Assuming a constant $87,500 per year payment, which is unlikely of course, and a term over fifty years, not the fifty-two years as was possible under the agreement, the net value of the sales agreement for livestock, equipment and land interests as of the date of the execution of August 12, 1983 was less than $1 million and, quickly amortized, perhaps about $900,000 in consideration that an amortized payment to purchase the ranch for $4.5 million with annual payments and interest at a modest ten percent would require an annual payment to total $453,114 rather than the $87,500 which was provided.

**4.** " '[W]e follow, * * *, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief.' " *Fiscus v. Atlantic Richfield Co.,* 742 P.2d 198, 202 (Wyo.1987) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

"The 12(b)(6) motion addresses itself solely to the failure of the complaint to state a claim and is not designed to correct inartistic pleadings * * *." Wright & Miller, Federal Practice and Procedure: Civil § 1356 at 590 (1969).

The Rule 12(b)(6) motion also must be distinguished from a motion for summary judgment under Rule 56, which goes to the merits of the claim and is designed to test whether there is a genuine issue of material fact. The Rule 12(b)(6) motion, * * *, only tests whether the claim has been adequately stated in the complaint."

*Id.* at 592. "Technically * * *, a post-answer Rule 12(b)(6) motion is untimely and some other vehicle, such as a motion for judgment on the pleadings or for summary judgment, must be used to challenge the failure to state a claim for relief." *Id.* at 593.

Our case law under *Savage v. Town of Lander,* 77 Wyo. 157, 309 P.2d 152, 156 (1957); *Lore v. Town of Douglas,* 355 P.2d 367 (Wyo.1960); and *Bruch v. Benedict,* 62 Wyo. 213, 165 P.2d 561 (1946), requires we consider this appeal on the facts upon which the district court made its decision and not whether the technical attack on the original pleading may or may not have been successful.

ages to the defrauded estate even after the contract was rescinded.

1. *It is established that* the contract was unconscionable.

2. *It is established that* the contract prepared in Zebre's office was negotiated in the presence of Zebre. After the contract was executed, Zebre delivered a copy to Galen West, the attorney for the Brooks estate who was the attorney Zebre had advised Patricia Brooks not to consult. First contact with opposing counsel was when Zebre advised West of the fait accompli.

3. *It is established that* Zebre intentionally did what he did in direct violation of explicit rules of conduct for attorneys adopted by the Wyoming Supreme Court.

4. Despite dispute about what, if anything, Zebre did to contact the attorney for the Brooks estate, there is no dispute that no contact was made before negotiating a final agreement with Patricia Brooks. Furthermore, *under the summary judgment standard of review, the appellant's version of the facts are accepted as true.*

5. What was said by Zebre to Patricia Brooks or to the co-trustee about legal advice from their attorney as the attorney of the estate is in conflict in the record. *Under the summary judgment standard of review, the appellant's version of the facts are accepted as true.*

6. Damages to the estate are not in dispute. The extent and significance of the damage is in conflict. *Under the summary judgment standard of review, the appellant's version of the facts are accepted as true.*

### III.

### SUMMARY OF ARGUMENT TO BE PRESENTED

In dealing with the perspective of our standard of review for the summary judgment disposition of this case, including its aspects of fraud, overreaching and ethical misconduct, it is helpful to outline what claims were made by the widow and the estate and the evidence considered when summary judgment was granted. The majority fails to relate the lack of casualness in Zebre's conduct portrayed by the record. If we must provide another blanket of civil immunity, it is only fitting and proper that we make clear we understand what it is we are protecting. Patricia Brooks stated in her answer and counterclaim:

23. That by undertaking the activities mentioned in paragraph 22, Third–Party Defendant ZEBRE owed a duty not only to his clients, JOHN F. ARAMBEL and PETER R. ARAMBEL, but also owed a duty to these Defendant/Third–Party Plaintiffs to perform said activities in a proper, skillful, and diligent manner as would reasonably be expected of attorneys similarly situated.

24. By his acts and omissions, Third–Party Defendant ZEBRE breached the duties owed to Defendant Third–Party Plaintiffs and such negligence includes, but is not limited to, the following:

A. ZEBRE failed to advise Defendant/Third–Party Plaintiffs that he could not represent the competing and conflicting interest of the ARAMBELS and the interests of these Defendant/Third–Party Plaintiffs.

B. ZEBRE failed to advise Defendant/Third Party Plaintiffs that their execution of the Memorandum Contract could result in the imposition of substantial liabilities for breach of Defendants/Counterclaimants' fiduciary duties.

C. ZEBRE failed to advise Defendant/Third–Party Plaintiffs of substantial tax liabilities which will result from the imposition of imputed interest on payments pursuant to the Memorandum Contract.

D. ZEBRE failed to advise Defendant/Third–Party Plaintiffs to seek independent counsel when ZEBRE learned that the attorney for the estate was out of town.

E. ZEBRE failed to advise as both his clients and Defendant/Third–Party Plaintiffs that execution of the Memorandum Contract should be postponed when it became apparent that Defen-

dant/Third–Party Plaintiffs were not represented by counsel.

F. ZEBRE failed to read and explain the entire contract to Defendant/Third–Party Plaintiffs before obtaining their signature thereon.

G. ZEBRE failed to advise Defendant/Third–Party Plaintiffs that the estate's shares of the Rock Springs Grazing Association would ultimately be transferred to the ownership of his clients if the option was exercised pursuant to the Memorandum Contract.

H. ZEBRE failed to advise Defendant/Third–Party Plaintiffs that the selling price for the ranch properties was only a small fraction of the market value of same when payments were made on 40–year or 52–year basis pursuant to said Memorandum Contract.

25. That ZEBRE owed the foregoing duties which were breached by him to these Defendant/Third–Party Plaintiffs because of special circumstances, including but not limited to the following:

A. ZEBRE had previously done legal work for the Brooks family prior to the death of ISAAC N. BROOKS.

B. ZEBRE had personally visited PATRICIA BROOKS at her home and personally contacted her during the negotiations leading up to the execution of the Memorandum Contract, although ZEBRE knew or should have known that the estate was represented by an attorney.

C. ZEBRE is related by marriage to JOHN F. ARAMBEL and PETER R. ARAMBEL.

In an amended cross-claim and third-party complaint, in view of the suggestion of the majority that consideration as a motion to dismiss might be appropriate, the claims were expanded and amplified:

COMES NOW the Defendants and Third–Party Plaintiffs, Patricia A. Brooks and Saima McCurtain, and for their Amended Crossclaim and Third–Party Complaint against John A. Zebre, dba John A. Zebre, a Professional Corporation, allege and state as follows:

## NEGLIGENCE

1. Defendant/Third–Party Plaintiffs reallege the allegations contained in Paragraphs 1 through 19 of the Counterclaim against the Arambels previously filed herein and incorporate them herein by this reference as if fully set forth.

2. Third–Party Defendant, JOHN A. ZEBRE, is, and at all times pertinent herein, was an attorney at law duly licensed to practice in the State of Wyoming. Third–Party Defendant is and was at all perti[n]ent times herein a resident of Sweetwater County, Wyoming.

3. That, prior to August 12, 1983, JOHN [A.] ZEBRE, was employed by JOHN F. ARAMBEL and PETER R. ARAMBEL to represent them in the negotiations with PATRICIA A. BROOKS. That JOHN A. ZEBRE undertook to conduct negotiations, prepare documents, advise the parties to the Memorandum Contract and to preside over the execution of the Memorandum Contract on August 12, 1983.

4. That, by undertaking the activities mentioned in Paragraph 22, Third–Party Defendant ZEBRE owed a duty not only to his clients, JOHN F. ARAMBEL and PETER R. ARAMBEL, but also owed a duty to these Defendant/Third–Party Plaintiffs to perform said activities in a proper, skillful, and diligent manner as would reasonably be expected of attorneys similarly situated.

5. By his acts and omissions, Third–Party Defendant ZEBRE breached the duties owed to Defendant/Third–Party Plaintiffs and such negligence includes, but is not limited to, the following:

(a) ZEBRE failed to advise Defendant/Third–Party Plaintiffs that he could not represent the competing and conflicting interest of the ARAMBELS and the interests of these Defendant/Third–Party Plaintiffs.

(b) ZEBRE failed to advise Defendant/Third–Party Plaintiffs that their execution of the Memorandum Contract would result in the imposition of substantial liabilities for breach of De-

fendants/Counterclaimants' fiduciary duties.

(c) ZEBRE failed to advise Defendant/Third–Party Plaintiffs of substantial tax liabilities which will result from the imposition of imputed interest on payments pursuant to the Memorandum Contract.

(d) ZEBRE failed to advise Defendant/Third–Party Plaintiffs to seek independent counsel when ZEBRE learned that the attorney for the estate was out of town.

(e) ZEBRE failed to advise both his clients and Defendant/Third–Party Plaintiffs that execution of the Memorandum Contract should be postponed when it became apparent that Defendant/Third–Party Plaintiffs were not represented by counsel.

(f) ZEBRE failed to read and explain the entire Contract to Defendant/Third–Party Plaintiffs before obtaining their signature thereon.

(g) ZEBRE failed to advise Defendant/Third–Party Plaintiffs that the estate's shares of the Rock Springs Grazing Association would ultimately be transferred to the ownership of his clients, if the option was exercised pursuant to the Memorandum Contract.

(h) ZEBRE failed to advise Defendant/Third–Party Plaintiffs that the selling price for the ranch properties was only a small fraction of the market value of same when payments were made on a 40–year or 52–year basis pursuant to said Memorandum Contract.

6. That ZEBRE owed the foregoing duties which were breached by him to these Defendant/Third–Party Plaintiffs because of special circumstances, including but not limited to, the following:

(a) ZEBRE had previously done legal work for the Brooks family prior to the death of ISAAC N. BROOKS.

(b) ZEBRE had personally visited PATRICIA BROOKS at her home and personally contacted her during the negotiations leading up to the execution of the Memorandum Contract, al-

though ZEBRE knew or should have known that the estate was represented by an attorney.

(c) ZEBRE is related by marriage to JOHN F. ARAMBEL and PETER R. ARAMBEL.

GROSS NEGLIGENCE

7. Defendant/Third–Party Plaintiffs reallege the allegations contained in Paragraphs 1 through 6 of the Cross-claim and Third–Party Complaint and incorporate them herein by reference as if fully set forth.

8. ZEBRE has been grossly negligent and ZEBRE's entire course of conduct in regard to BROOKS and McCURTAIN has been in bad faith, is outrageous, and evinces a wanton, willful, reckless and wrongful disregard for the rights and interests of these Third–Party Plaintiffs, and as such, entitles Third–Party Plaintiffs to recover punitive and exemplary damages from ZEBRE in an amount to be determined at trial.

THIRD–PARTY BENEFICIARIES

9. Defendants/Third–Party Plaintiffs reallege the allegations contained in Paragraphs 1 through 8 of their Cross-claim and Third–Party Complaint against ZEBRE heretofore filed herein and incorporate them herein by this reference as if fully set forth.

10. ZEBRE knew, or should have known, that Defendants/Third–Party Plaintiffs entered into the Memorandum Contract for the benefit of the heirs of ISAAC N. BROOKS, deceased, and for the benefit of the beneficiaries of the Testamentary Trusts established by the Last Will and Testament of the late ISAAC N. BROOKS, namely: PATRICIA A. BROOKS, ELIZABETH BROOKS KAUMO, KATHY ANN BROOKS, ISAAC N. BROOKS, JR., IDA JENNIE BROOKS and SAIMA BROOKS, and the damages described in Paragraph 15 below would be sustained by said heirs and said Trust beneficiaries.

### FRAUD

11. Defendants/Third–Party Plaintiffs reallege the allegations contained in Paragraphs 1 through 10 of their Crossclaim and Third–Party Company against ZEBRE heretofore filed herein and incorporate them herein by this reference as if fully set forth.

12. In addition to undertaking the activities mentioned in Paragraph 22 of the Crossclaim and Third–Party Complaint, and commit[t]ing the acts and omissions enumerated in Paragraph 24 of the Crossclaim and Third–Party Complaint, ZEBRE violated DR 7–104(A)(1) when he communicated with Patricia A. Brooks about the Memorandum Contract when he knew, or should have known, she and the Brooks Estate were represented by Galen West, an attorney-at-law, practicing in Rock Springs, Wyoming.

13. ZEBRE further violated DR 7–104–(A)(2) when he gave legal advice, other than to secure counsel, to Patricia A. Brooks on August 11, 1983 and on August 12, 1983 when he knew that there was a reasonable possibility that the interests of Patricia A. Brooks and the Brooks Estate would be in conflict with the interests of his clients, John F. Arambel and Peter R. Arambel.

14. In rendering legal advice to Patricia A. Brooks, ZEBRE commit[t]ed the following specific fraudulent acts and omissions:

(a) On August 11, 1983, at his law office while meeting with the Arambels and Patricia A. Brooks and while discussing terms and conditions of the proposed Memorandum Contract, he called his brother, MICHAEL ZEBRE, into the meeting on the pretext of explaining the tax consequences of not including interest in an installment sales agreement.

(b) ZEBRE and his brother purposely failed to fully disclose the adverse effect that imputed interest would have upon the interests of Patricia A. Brooks and the Brooks Estate heirs as sellers, in the Memorandum Contract.

(c) On August 12, 1983 at approximately 7:00 o'clock, A.M., ZEBRE and the ARAMBELS met with LES HENDERSON, a Certified Public Accountant, who explained the tax consequences of imputed interest as it would relate to the proposed Memorandum Contract.

(d) On August 12, 1983, ZEBRE met with PATRICIA A. BROOKS, SAIMA McCURTAIN and the ARAMBELS at his law office and conducted the closing of the sale of the Brooks Ranch property and witnessed the execution of the Memorandum Contract. At said closing, he purposely and intentionally failed to make another disclosure of the tax consequences of imputed interest to PATRICIA A. BROOKS and SAIMA McCURTAIN.

(e) On August 11, 1983, at the meeting described in Paragraph 5(a) above, ZEBRE purported to render legal advice to PATRICIA A. BROOKS and represented to her that his brother, who is a graduate accountant and a practicing attorney in the State of Wyoming, would be able to render competent advice with respect to the tax consequences to the imputed interest, knowing that PATRICIA A. BROOKS would rely upon such advice. On August 12, 1983, ZEBRE, after having discussed the tax consequences of imputed interest with a Certified Public Accountant, purposely and intentionally withheld the full explanation thereof from PATRICIA A. BROOKS and SAIMA McCURTAIN prior to and at the execution of the Memorandum Contract.

(f) PATRICIA A. BROOKS justifiably relied upon the representations made to her by ZEBRE and his brother on August 11, 1983 and since no further disclosures were made regarding the consequences of imputed interest on August 12, 1983, she and SAIMA McCURTAIN did execute the Memorandum Contact.

15. As a direct and proximate cause of the negligence, gross negligence and fraudulent acts of ZEBRE and of his

failing to fully disclose the tax consequences of imputed interest to PATRICIA A. BROOKS and SAIMA McCURTAIN prior to the execution of the Memorandum Contract, PATRICIA A. BROOKS and the BROOKS' HEIRS have suffered the following damages:

(a) Attorneys' fees and costs in successfully having the Memorandum Contract set aside in the sum of $83,292.01.

(b) Loss of the use, rents and profits of the cattle, sheep, farm vehicles, machinery and equipment [of] the BROOKS RANCH from the date of the execution of the Memorandum Contract to the date said Contract was set aside.

(c) The loss of the opportunity to sell the BROOKS RANCH in the amount of $1,100,000.

(d) Restitution required to be paid to the ARAMBELS by Court Order in the sum of $440,000.

(e) Other cost and expenses in an amount to be proved at trial.

The history between the families was related in Patricia Brooks' brief:

For over two generations there was a close relationship between the Arambels and Isaac N. Brooks. John Arambel and Ike Brooks grew up together, were neighboring ranchers and lived one block from each other in Rock Springs, Wyoming. John Arambel considered Ike Brooks to be his closest friend. * * *

Zebre, who is related to the Arambels by marriage, also was well acquainted with Ike and Pat Brooks. * * * In November of 1982, Zebre visited Ike Brooks at his home during his last illness. During that visit Zebre reviewed Ike's Will in the presence of Pat Brooks. Zebre told them that he saw potential tax problems with the Will, as drafted at that time, in terms of tax consequences that would occur at such time as Ike would pass away. Zebre suggested a more detailed review of the Will and the possible use of other estate planning vehicles such as a series of trusts. A subsequent meeting between Pat Brooks and Zebre at his law office was discussed. Several days later Zebre called Pat Brooks to arrange for an office appointment. No further estate planning discussion or meetings were held because Pat Brooks was preoccupied with her husband's deteriorating health. * * *

On March 29, 1983, Isaac N. Brooks died. On April 15, 1983, the Last Will and Testament of Isaac N. Brooks was admitted to Probate in the District Court of Sweetwater County, Wyoming in Probate No. P–83–32 * * *. Patricia A. Brooks, widow of the decedent, was appointed Personal Representative of said Estate. * * *

\* \* \* \* \* \*

The principal asset of the Brooks Estate was a complete working ranch located in Sweetwater County, Wyoming. The Brooks Ranch consisted of the following real and personal property:

| Item | Appraisal * * * |
|---|---|
| Deeded land, shares of common stock of the Rock Springs Grazing Association, grazing and agricultural leases and permits issued by the State of Wyoming, U.S. Bureau of Land Management, and Union Pacific Land Resources Corporation | $2,100,000 |
| Cattle and sheep | $ 830,831 |
| Vehicles, trailers, tractors, motorized implements other implements, bailers and mowers, corrals and wire, household items, power tools and motors, and tanks and wagons | 112,222 |
| TOTAL | $3,043,053 |

## EARLY NEGOTIATIONS

In the latter part of May, 1983, approximately two months after the death of Isaac N. Brooks, the Arambels began a series of frequent, almost daily, visits with Mrs. Brooks at her home or by telephone, which continued through the first part of August, 1983. * * * During these visits and conversations, Mrs. Brooks expressed an interest in leasing the Brooks Ranch. She communicated her concern to the Arambels about the

future of Isaac N. Brooks, Jr. She indicated her desire to keep the minerals for her daughters. She was definite about retaining the Rock Springs Grazing Association Stock for her son. She told Arambels she thought the Brooks Ranch operation was worth 4.5 million dollars. * * *

Mrs. Brooks testified at the trial as to what happened next as a result of the Arambel visits:

"Well, they just kept coming and telling me what they were going to do for Newt and how they were going to help me out, and that my kids and that could go out there and we could and stay at the summer ranch anytime we wanted to.... Well, I just decided I thought I would lease it to them because I felt I could trust John. I didn't know who else I could trust. And so I decided that I would lease it to him, and then they called me to Zebre's office." * * *

## FIRST MEETING AT ZEBRE'S OFFICE

A meeting was held in Zebre's law office on August 11, 1983. Those persons in attendance were John Zebre, John Arambel, Sr., Peter Arambel, Pat Brooks and her daughter, Kathy Brooks. * * * Zebre, who was related by marriage to John Arambel, represented the Arambels throughout this transaction. * * * At the outset of the meeting, Pat Brooks advised Zebre that Galen West, a local Rock Springs attorney, was handling the probate of her deceased husband's estate, and that the will being probated was a new and different will than the one Zebre reviewed for Ike Brooks at his home in November, 1982. * * * Zebre, at this point in the meeting, claims that he attempted to call Galen West. He stated that he was informed that Mr. West was not in his office, he left word for Mr. West to return his call, but that he did not talk to Galen West that day. * * * Pat Brooks suggested to Zebre that Mr. West be involved in the negotiations. * * * In response to this suggestion, John Arambel told her, "You

don't need to talk to Galen West because he won't let you do it because he wants all the money". She further states that Zebre told her, "Don't tell Galen [West] because he'll just tell you not to lease that ranch". * * *

In all events, the meeting held in Zebre's law office on August 11, 1983 proceeded without West or any other attorney representing Pat Brooks, the Brooks children, or the Brooks Estate.

The entire meeting, which lasted about one hour, consisted of oral conversations. There were no minutes or records of the meeting taken, and there were no drafts of any agreements or other documents reviewed or discussed at the meeting. Mrs. Brooks testified that she did not understand all of what was being discussed. * * * Her recollection of the nature and contents of the matters discussed at the meeting were extremely vague. She stated that she could recall no discussions about an option to purchase the ranch, about a forty year lease, about a sale of all the cattle and sheep, and other essential terms and conditions of the final agreement. * * *

* * * * * *

Zebre, however, recalls that Mrs. Brooks was "very poised, confident", and that "she was very certain and very positive, confident about what she was there about, what was happening." * * * He further recalled with great detail and specificity the items discussed at the meeting. He stated that "some terms were dictated to me by Mrs. Brooks, some terms were dictated to me by Arambels". * * * Zebre recalls that one of the matters discussed was the question of interest. * * *

* * * * * *

At this point Michael Zebre entered the meeting at the request of his brother, John Zebre. Mike Zebre has impressive credentials as a graduate accountant, a lawyer, a licensed real estate salesman, IRS tax practitioner, and a CPA candidate. * * * Mike Zebre recalls his participation in the meeting as follows:

"I was buzzed on the phone and John asked me to come in and answer a question about imputed interest."
\* \* \*

He then stated:

"I said that if anyone doesn't include—generally, if one doesn't have 9% interest in a contract the IRS will impute 10% interest. And I believe that I said after that that some portion of whatever payments Mrs. Brooks would receive would be considered interest income.... I expressed that that would be an adverse type of thing to have the IRS do to someone.... I said that instead of it being a principle reduction it would be interest income." \* \* \*

Mike Zebre further recalls that he was in the meeting approximately five to ten minutes, he did not give any examples of the consequences of imputed interest, and no one in the meeting, including Mrs. Brooks, asked any questions of him. \* \* \* Mike Zebre did not advise Mrs. Brooks to talk to an attorney or to talk to an accountant about imputed interest. \* \* \* Mike Zebre freely admits that he was called into the meeting by his brother, John Zebre, for the purpose of giving advice and explaining the tax consequences of imputed interest. He stated in his deposition as follows:

"Q. You did in fact give her advice, though, didn't you?
A. Yes." \* \* \*

### IV.

### LEGAL MALPRACTICE

#### A. Duty of Zealous Representation

The majority notes that Brooks and the bank "premise their contentions upon precedent from other jurisdictions." That is a curious notation while we watch the majority itself reach out for precedent from other jurisdictions to justify this remarkable decision. Whatever else may be said, the result in this case cannot be said to be driven by Wyoming precedent. It is driven by something else.

The majority looks to *Friedman v. Dozorc,* 412 Mich. 1, 312 N.W.2d 585 (1981) as the flagship case for its rationale. I agree with both the holding and rationale in *Friedman,* but I am perplexed how either the holding or rationale applies here. The plaintiff in *Friedman* argued an attorney has a duty to "conduct a reasonable investigation and re-examination of the facts and law" before *initiating a civil suit. Id.* 312 N.W.2d at 589. Even the *Friedman* defendants said they would have allowed liability in the presence of fraud or collusion. *Id.* at 590. The suit here would not chill the vigor necessary to the adversarial system since Patricia Brooks and the bank are not suing because of actions by an opposing attorney in a civil suit. Reliance on *Friedman* is misplaced.

It should be recognized that no case as egregious as this has been found where civil immunity has been provided for misconduct under the mantle of zealous advocacy.[5] *See* Annotation, *Attorney's Liability, To One Other Than Immediate Client, For Negligence in Connection With Legal Duties,* 61 A.L.R.4th 615 (1988); Annotation, *What Constitutes Negligence Sufficient to Render Attorney Liable to Person Other Than Immediate Client,* 61 A.L.R.4th 464 (1988); Annotation, *Attor-*

---

**5.** *Crutchley v. First Trust and Savings Bank,* 450 N.W.2d 877 (Iowa 1990) is similar but involves a real estate broker. The transaction involved a non-recourse real estate sales contract which plaintiff alleged was inadequately explained before execution, resulting in a large loss after default. Both contract and negligence claims were based upon (1) inadequate and incomplete explanation of the contractual provisions; (2) failure to affirmatively recommend use of independent counsel by the sellers; (3) "in discouraging plaintiffs from seeking legal counsel," the realtor's code of ethics provisions were admitted into evidence as proof of the violation of the ethical standard as evidence upon which a finding of fact of negligence could be made. *Id.* at 880. With disputed evidence of what had been said about independent counsel, a trial resulted in judgment against the realtors of $536,250, which the Iowa Supreme Court affirmed on both a breach of listing contract theory and a tort professional negligence theory. *Id.* at 879. Except what was done to Patricia Brooks is more egregious since independent counsel existed, she was a court officer as personal representative (administratrix) and the defendant was an attorney, this case provides a very comparable factual comparison.

*ney's Liability, To One Other Than His Immediate Client, For Consequences of Negligence in Carrying Out Legal Duties,* 45 A.L.R.3d 1181 (1972). Zebre used his legal license to commit a fraud not only on a recently widowed, unsophisticated individual, but on the court system and the minor heirs who had a direct interest. This fraud was accomplished by excluding the estate attorney who could have provided some usable information. The estate attorney described his consternation and anger in detail at trial as he described his initial interviews with the defrauded widow:

Q. Now, in your meetings on August 15th with Mrs. Brooks and August 19th, I think you said on direct examination that you expressed to her what you thought the contract, the present value of that contract, was worth?

A. Yes.

Q. Could you tell us what you told her?

A. I told her that I thought it was worth—that I couldn't tell her exactly how much 'cause, you know, there were some calculations that had to be done, but I thought it was worth considerably less [than] a million dollars.

Q. And at that time, of course, there wasn't an appraisal in the estate; but did you have any idea what the property was worth, what the ranch was worth?

A. Yes.

Q. Could you tell us what that was?

A. What I was afraid it was worth was about five million dollars.

Q. At that time?

A. Yes.

Q. Did you tell her that?

A. Oh, yes.

Q. So you said, "You're selling a five-million-dollar ranch for a million-dollar contract."

A. Right.

The majority allows the notion of privity to drive this result and ignores a pre-eminence of Wyoming's ethical standards for legal conduct. We could and should do better if the public respect we seek for the legal profession is to be achieved.

[T]o the extent that disciplinary violations go unpunished, the application of codified ethical standards in legal malpractice proceedings may be an additional deterrent against unethical conduct. In fact, in some cases, a monetary penalty in civil litigation may be a more meaningful sanction than a private admonition or reprimand in the disciplinary system.

Hoover, *The Model Rules of Professional Conduct and Lawyer Malpractice Actions: The Gap Between Code and Common Law Narrows,* 22 New Eng.L.Rev. 595, 616 (1988).

*The basis for defining this case is the admitted and accepted violation of one of the fundamental tenants of legal practice: "You do not negotiate ex parte with another lawyer's client."*[6] *"Hoffman's Resolution XLIII was: 'I will never enter into any conversation with my opponent's client relative to his claim or defense, except with the consent and in the presence of his counsel.'"* H. Drinker, *Legal Ethics* 201 (1953) (emphasis added).

A further meeting was held the next morning at 7:00 a.m. attended by the Aram-

---

**6.** Wyoming's Rules of Professional Conduct for Attorneys at Law 4.2 states:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

This present rule was adopted by order of the Wyoming Supreme Court on November 7, 1986. Disciplinary rules in effect in August 1983, at the date when the conduct occurred, were the same as the historical national standard, DR 7-104, Communicating With One of Adverse Interest, which states:

(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so;

(2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client.

bels and Zebre with their accountant in order, apparently, to again discuss the advice that had been furnished to Patricia Brooks regarding imputed interest. The information obtained was never revealed to her nor the fact that the meeting had ever been held until developed in litigative discovery many months later.

Zebre claimed that as he left the accountant's office on August 12, 1983, he called the law office of the estate attorney, Galen West, who was not in, and then went to the house of West's client, the widow Patricia Brooks, and picked up a copy of the will and returned to his office to prepare the sales agreement to be signed at 4:00 p.m. that afternoon.

The confused and befuddled widow was called back into a meeting at 4:00 p.m. that afternoon without contact having been made by Zebre with the estate attorney or advice provided that negotiations were underway. The sales agreement was signed and before the transaction got unscrambled twenty-six months later, the estate and the heirs had sustained losses and damages of at least $1.83 million from costs, losses and delay and litigative expenses.

The "acquisition" of the Brooks Ranch by the Arambels was treated for tax purposes, as it was, as a purchase on partnership tax returns. Contrasted with the listed $3.5 million value shown on the transaction agreement document, the Arambels provided a realistic valuation for tax purposes on the partnership income tax return. For the 1984 tax return, as the first annual period, prepared but not filed after acquisition, including livestock sales of $116,369 with a "cost" of $55,440, the purchasers capitalized the ranch acquisition as: machinery $25,070.14; trucks $16,475.47; breeding herd cattle $305,664.29; breeding herd sheep $169,295.82; household furniture $1,617.51 and land $346,221.37.

Incredibly, they took depreciation on the acquired property for that first full year of $110,636 to help accumulate an intended partnership tax loss write-off totaling $214,190. The 1983 tax return for the few months of operation was similarly tax loaded to show a loss of $61,834 with no beginning capital and no capital contributed so that each of the two participants took a $30,917 tax loss without capital investment for credit against other income. The December 31, 1984 ledger shows at a booked out payable for the purchase, "Mortgage Payable–Patricia Brooks, $676,250.18"; "Notes Payable–Brooks–Cattle, $327,-105.83"; and loan obtained from the PCA secured by the assets purchased from the PCA of $247,895.68.

The Brooks Ranch consisted of 14,038 acres deeded grazing land; 5,054 acres irrigated land; 10,563 leased land state; 520 acres leased land Union Pacific; 12,297 AUM BLM lands; and 4¾ shares of the Rock Springs Grazing Association stock which permitted grazing on the alternative sections owned by the Union Pacific and the stock for agricultural purposes in the area at a very significant value.

When the property was recaptured from the Arambels, the personal property and livestock which had been appraised at $946,803 was sold for $737,481. The real estate which the Arambels listed as a purchase of $346,221.37 was sold by the estate for $1 million. Consequently, what the Arambels listed as a purchase in 1983 totalling $346,221.37 was sold by the estate in 1986, after a severe drop in ranch land values for $1 million payable in cash and not over fifty-two years. Unfortunately, the sale price was impacted by the $440,000 Arambel management settlement and something more than $86,000 in legal fees.

However proximately caused, this estate sustained a very severe loss and decrease in value between the date of death of Brooks in 1983, compared to what is available in this record showing the actual receipts after the Arambel transaction was unraveled, and final liquidation in 1986.[7]

For this appeal, as a summary judgment absolution of the conduct portrayed, we are required to examine whether Zebre in-

---

7. Widows seem to be fair game in Wyoming adjudicatory history. *Cf. Matter of Hartt's Estate,* 75 Wyo. 305, 295 P.2d 985 (1956); *Hartt v.*

*Brimmer,* 74 Wyo. 338, 287 P.2d 638 (1955); and *Delfelder v. Poston,* 42 Wyo. 176, 293 P. 354 (Wyo.1930).

curred any enforceable economic responsibility for that million dollar loss. The majority declines to enforce a responsibility, and I dissent. First, the majority eschews assessing responsibility for the conspiring attorney on the providence of zealous performance of duties for the client. The entire conjecture provided to sustain their holding misses the point. Zebre orchestrated negotiations and sale of the estate property *in the absence of the estate's attorney.* As such, he assumed the fiduciary responsibility or he was deliberately participating in conspiratorial fraud. Averill, *Attorney's Liability to Third Persons for Negligent Malpractice,* II Land & Water L.Rev. 379 (1967).

> [T]here is an aspect of this problem which goes to the heart of the legal profession. The attorney holds a responsible position in the community. In a sense he has been given a monopoly. Only a select few who qualify may represent that they can perform the specialized tasks. Because of the attorney's status he must always maintain a high standard of conduct toward the court and the community. One of the more recurring cries today is the need to improve the general reputation of and respect for the legal profession. Unfortunately many laymen feel that there is one rule of law when they are the defendant and another when the attorney is. This is particularly true when the attorney is sued for negligence. An injured client in such litigation rather than having one attorney advocating his side of the case, one against him and one neutral seeking justice, in fact *might* feel that he is not

only faced with one against him but also with two subconsciously hostile. This kind of attitude toward the bar must be changed.

*Id.* at 402–03 (emphasis in original and footnotes omitted). *See* Note, *The Rules of Professional Conduct: Basis for Civil Liability of Attorneys,* 39 U.Fla.L.Rev. 777 (1987). *Cf.* Faure and Strong, *The Model Rules of Professional Conduct: No Standard for Malpractice,* 47 Mont.L.Rev. 363 (1986).

I will discuss in detail other circumstances which must be assumed to be true under summary judgment review and the appropriate legal application to the status of the attorney as he assisted the buyer and advised the seller in violation of legal ethics. ABA, *Opinions of the Committee on Professional Ethics* 43 (1967); ABA, *Model Code of Professional Responsibility and Code of Judicial Conduct,* DR 7–104 at 37 (1982).

The majority seems indifferent to breaches in Wyoming's canons of professional responsibility and disciplinary code by an attorney negotiating directly with a represented person without notification or approval of the by-passed attorney. Again, the majority draws too tightly the absolution against misfeasance responsibility *under these circumstances.* The majority also ignores the more modern approach when it allows no civil remedy for damages for intentionally caused harm in violation of basic canons of legal practice and responsibility which, although it may not create a cause of action, defines a duty of due care.[8]

---

8. Also disregarded is Restatement (Second) of Torts § 552 (1977).

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

The majority casually inferred fraud by stating:

> Brooks and the Bank are not able to establish on the record any actual misrepresentations or statements allegedly made by Zebre with knowledge that they were false and with the intent that Brooks should rely upon them. * * *
>
> * * * Brooks and the Bank [successor trustee] have failed to assert any facts necessary to establish the elements justifying a cause of action for fraud.

The entire transaction in text and tenor was patently fraudulent in a fashion not significantly less obnoxious than any sale of the Brooklyn Bridge.

It is the majority who determines that an attorney in violation of the canons of professional responsibility assumes no economic responsibility when he advises the person he is defrauding not to consult that person's attorney. I will address the three rationale offered by the majority. These issues are (1) absolution of the conspiring attorney by excuse of zealous representation; (2) disregard of violated professional responsibility as an officer of this court by direct negotiation with a represented individual; and (3) fraudulent misrepresentation of the defrauded individual's need for legal assistance in arranging a sales transaction which can best be characterized as cheating a widow and her minor children to steal their inheritance. Comprehensive fraud in the entire transaction occurred by abusing the interests of an individual who, inexperienced as she was, simply had no knowledge of the time value of money.

## B. Assumed Responsibility by Conduct

The meeting at which the "unconscionable" sales agreement was first addressed occurred in Zebre's law office.

THE COURT: Let me interrupt. Who was there the first time you went?

THE WITNESS: My daughter Kathy, and Pete and John, and Mr. Zebre.

Q. (By Mr. White) Now, during that meeting, were you represented by an attorney?

A. No.

Q. At that time, was the estate in progress?

A. Yes.

Q. Who was the attorney for the estate at that time?

A. Galen West.

Q. And did you suggest that Mr. West be involved in these negotiations?

A. I said—yes. I told them that I thought that I should talk to Galen being that he, you know, was representing the estate. And John says, "You don't need to talk to Galen because he won't let you do it because he wants all the money."

Q. Now, Mrs. Brooks, there are two John's that were present.

A. John Arambel.

Q. John Zebre and John Arambel.

A. And John Zebre told me, too, not to talk to West about it because he wouldn't want me to lease it.

Q. Now, just repeat again, what did John Arambel say?

A. He told me not to get Galen because he said, "All he'll do is tell you not to do it, 'cause he'll want all your money."

Q. And what did Mr. Zebre say?

A. And he said, "Don't tell Galen because" he said, "he'll just tell you not to lease that ranch."

The next meeting occurred when Zebre came to the house of Patricia Brooks:

Q. What happened, then, after that [earlier] meeting?

A. Kathy and I left and went home. And then Mr. Zebre came to my house.

Q. Did he call you before he came to your house?

A. He called me and said, "I'll be stopping on my way back from lunch." He said, "I live right up the hill from

*Id.* at 126–27. *See First Florida Bank v. Max Mitchell & Co.,* 558 So.2d 9 (Fla.1990). *See also Eisenberg v. Gagnon,* 766 F.2d 770 (3rd Cir. 1985), where Restatement (Second) of Torts, *supra,* § 552 was applied to the attorney in a tax shelter securities case involving negligent misrepresentation; and *Stinson v. Brand,* 738 S.W.2d 186 (Tenn.1987), the sole attorney real estate transaction case.

you." And he said, "I'll stop on my way back." He said, "I want to talk to you."

Q. Well, now, is this the same day?

A. No, this was a day after or so. And when he come back, he wanted the will and he had a paper. My brother was there. And my brother asked him something about the equipment.

Q. Well, Mr. Zebre came to your house how many times before the contract was signed?

A. Twice.

Q. Okay. Now, we'll be talking about the first time. What happened? Why did he come to your house the first time?

A. He came for the will.

Q. A copy of the will?

A. A copy of the will.

Q. Why did he say he needed that?

A. He didn't. He just said he wanted a copy of the will; he wanted to read it.

A third visit occurred by a trip of the attorney to the house of Patricia Brooks:

A. And then he come back some other time and he had the contract or whatever it was. I can't remember if it was a contract. Jimmy was there, my brother, and my brother asked him something about the equipment.

Q. Now, he came to your house a second time?

A. Yes.

Q. When was that in relation to the first visit?

A. That was like a day before the contract.

Q. This would be like August 11th, 1983?

A. Uh-huh.

Q. And what time of day did he come to your house?

A. Oh, I'd say it was a little after one o'clock, not too long after that. About five after one.

Q. And who was present when he arrived?

A. My brother Jim.

Q. And yourself?

A. And myself.

Q. And what transpired?

A. Well, he had the lease, and he got to talking and Jim said—Jimmy read some of the lease. And then my brother says, "Well, how about this equipment in here?" And he says, "Well, don't worry about a thing, 'cause we're not going to cheat your sister." And he got up and left.

Q. Mr. Zebre said that—

A. Yes.

Q. —to your brother Jim?

A. Yes.

And again the next day after John Arambel called her to go to Zebre's office to sign the "lease":

A. Well, it was like one o'clock, and they told me to be down there right away. So, I went right down. And—

Q. Now, excuse me. They called you on the day you signed the contract?

A. Yes.

Q. What time did they call you?

A. It was around one o'clock, I'd say. Maybe a little after.

Q. What did Mr. Arambel say in that telephone conversation?

A. He said, "We have the lease ready. Would you come down and meet us at Zebre's office to sign it?"

Q. Did he give you any reason why that particular time?

A. No.

Q. Was there any sense of urgency in that or what?

A. No. They just said that they had to get back to Farson to work. They wanted to get the contract signed.

Q. So, when did they tell you to be down to Zebre's office?

A. They called and told me to come down right away.

Q. So, they called you about one o'clock and told you to come down right away?

A. Yes.

Q. And did you go to Zebre's office right away?

A. Yes.

Q. And approximately what time did you arrive at Zebre's office?

A. I would say it was around one-thirty.

Q. Did you talk to anybody prior to going down there?

A. No.

Q. Did you go by yourself or with somebody?

A. I went by myself.

Q. Who was in Zebre's office when you arrived?

A. Pete and John and Mr. Zebre.

Q. And there were no other persons?

A. No.

Q. Tell us, then, when you arrived what happened?

A. When I got there, I was sat down for a few minutes, and then they—and the girl says, "Well, you can go in. Go back." So, I went back and I sat down. And they had the contracts all there. There was a stack of them. And he said, "We read through it, parts of it." I didn't understand. I didn't bring my glasses, so I couldn't read it. And he—

Q. Did you tell him that?

A. Yes, I told him, I says, "Well, I can't read it 'cause I didn't bring my glasses."

Q. Okay.

A. And he read through it and then he said, "Here, sign it." So, I signed it. And then after I signed it—

Q. Excuse me, Mrs. Brooks, but you say he read through it. Did he read word for word?

A. I don't think so.

Q. Did you understand what he was saying?

A. No.

Q. Did you ask him to delay the signing of the contract 'till you saw your attorney?

A. No, I did not.

Q. Did they offer to postpone the signing of the contract 'till you had an opportunity to see an attorney?

A. No.

Q. Did John Arambel suggest you wait until you saw an attorney?

A. No.

Q. Did Peter Arambel suggest you wait?

A. No.

Q. Mr. Zebre?

A. No.

Q. So, you didn't read the contract?

A. No.

Q. And is it your testimony that Mr. Zebre read parts of the contract?

A. Yes.

Q. Then what happened?

A. Then I signed it. And then Mr. Zebre said, "Well, I better call Saima right away." And I said, well, I didn't know if Saima had been back from California yet or not. And he said, "Well, I'm calling her anyway."

Q. Now, when you say "Saima"—

A. McCurtain.

Q. Saima McCurtain. And did he— did Saima come to the meeting?

A. Yes, she did.

Q. How long a period of time was it after you signed it before she came to the meeting?

A. I think around fifteen minutes, Saima was there. She came right from work.

Q. Tell us what happened as soon as Mrs. McCurtain arrived at the meeting.

A. Well, she came in and she sat down at the far end of the table. Mr. Zebre handed her the contract and told her to sign it. And she says, "Well, do you think I should read it first?" He said, "No, I don't think it's necessary."

Q. Now, did you have an opportunity to talk with Mrs. McCurtain—

A. No, I didn't.

Q. —prior to the time she signed the contract?

A. No.

Q. Did you talk to her at all before that time?

A. No.

Q. All right. Did she read the contract; do you know?

A. She just went over parts and she asked me, "How about the Rock Springs Grazing?" And I said, "No, I'm just letting them use the ground on it." And

then she signed it. And then Mr. Zebre told her it didn't matter whether she signed it or she didn't sign it.

Q. Did she sign the agreement after you signed it?

A. After John and Pete and I had signed it, then Saima signed it after—when she came in.

Q. Did she receive a copy of the contract?

A. I don't remember whether she—I don't think she did.

Q. Did they suggest to her that she would have an opportunity to have an attorney present for her?

A. No.

\* \* \* \* \* \*

Q. (By Mr. White) Now, after she signed the contract, what happened?

A. Well, they got up and we went out of the office. And Saima was going ahead of me, and when I got my coat on, I heard John Zebre say, "I can't wait to throw these in Galen's face Monday morning.[9]

What right for the contended million dollar loss does the defrauded seller have against the attorney who pursued the conduct described? This case is epitomized by relevancy to a death penalty statement involving prosecutorial activity. *Minnick v. State*, 551 So.2d 77 (Miss.1988).

> We have a rule that seems to work well in civil cases. A lawyer is forbidden to communicate with the opposing party

who has a lawyer without that lawyer being present. At the very least, he must give notice of his intentions to or obtain consent of opposing counsel. This rule is undergirded by an ethical principle. *All accept that a lawyer who approaches a represented third party without going through counsel should be severely sanctioned.* And this is so though the lawyer uses a lay representative or paralegal to do his dirty work.

> Think what we would do in a personal injury case. The injured party is represented and has been engaged in settlement negotiations with the prospective defendant and his lawyer. Unbeknownst to plaintiff's lawyer, defense counsel's paralegal investigator approaches plaintiff and emerges with a settlement agreement for a sum substantially less than counsel had been demanding. Or, suppose the investigator obtained a(n) oral) statement that compromises plaintiff's case. *We know well what would happen, the only point of mystery being whether defense counsel would be shot or flogged.*

*Id.* at 101 (emphasis added and footnotes omitted). *See also Trans–Cold Express v. Arrow Motor Transit, Inc.*, 440 F.2d 1216, 1219 (7th Cir.1971) and *Bruske v. Arnold*, 44 Ill.2d 132, 254 N.E.2d 453 (1969).

Zebre assumed the responsibility of an advising attorney when he advised Patricia Brooks to exclude her counsel. Since Zebre undertook to advise, direct, and control

---

**9.** Whether apocryphal, the *"trust me"* status of these negotiations provides comparison to the attorney-client status in *Barbara A. v. John G.*, 145 Cal.App.3d 369, 193 Cal.Rptr. 422 (1983). In that case, the attorney told his female client that "I can't possibly get anyone pregnant.'" *Id.* 193 Cal.Rptr. at 426. She accepted and found that he could and she, in result, suffered a tubal pregnancy from which she sustained permanent injury. The judgment on the pleadings granted to the attorney by the trial court was reversed on appeal despite California's "anti-heart balm" statute. The court reasoned that the requested trust, followed by reliance on the attorney's sterility, was badly misplaced and with injuries sustained, claim for damage in deceit as well as battery was appropriate. Within application of the factual scenario, elements for a properly pleaded claim for damage from misplaced trust included:

> In pleading a cause of action for deceit, a plaintiff must specifically plead the following elements: (1) a false representation (ordinarily of a fact) made by the defendant; (2) knowledge or belief on the part of the defendant that the representation is false, or that the representation was made by defendant without reasonable grounds for believing its truth; (3) an intention to induce the plaintiff to act or to refrain from action in reliance upon the misrepresentation; (4) justifiable reliance upon the representation by the plaintiff; (5) damage to the plaintiff, resulting from such reliance.

*Id.* at 427.

All being properly pleaded, a claim was stated to assert liability against the non-sterile attorney who asked her to "trust me."

the negotiations, he assumed responsibility to both parties. When he said he would not cheat the estate and Patricia Brooks, we need only enforce that bargain by requiring a compensatory payment equal to the losses his legal activities precipitated. *Collins v. Binkley*, 750 S.W.2d 737 (Tenn. 1988). Recognizing that legal assistance is needed to protect a pending estate when the attorney excludes proper counsel, he then assumes that responsibility by replacement. *Cf. Fickett v. Superior Court of Pima County*, 27 Ariz.App. 793, 558 P.2d 988 (1976). Furthermore, where there is a duty to speak, which here was certainly created by Wyoming's Rules of Professional Conduct for Attorneys at Law 4.2, silence may be as misleading as a positive misrepresentation of existing facts. *Hennigan v. Harris County*, 593 S.W.2d 380 (Tex.Civ.App.1980).

A vast collection of case law, *see* Treece & Hall, *Attorney's Liability: Negligent Misrepresentations to Third Parties—a Growing Threat*, 31 For The Defense 18 (July 1989), some of it cited by the majority, can be found but no case approaches this factual situation. Categories of cases with little precedential value to this case are included in Zebre's brief and the majority opinion. The first case involved a litigation privilege case. Here, no litigation was involved when the fraudulent misrepresentation developed. *Silberg v. Anderson*, 50 Cal.3d 205, 50 Cal.3d 343A, 266 Cal.Rptr. 638, 786 P.2d 365 (1990). The answer suggested in *Silberg* need not be applied here—criminal prosecution for perjury, solicitation of perjury, or even, though clearly appropriate, state bar disciplinary proceedings. Lacking practical involvement in pending litigation with bi-lateral representation, the interest of justice criteria can be maintained. Cf. *Bradley v. Hartford Accident and Indemnity Co.*, 30 Cal.App.3d 818, 106 Cal.Rptr. 718 (1973). This general category of cases deals with a disgruntled litigant's suit against the opposing attorney. *Briscoe v. LaHue*, 460 U.S. 325, 333, 103 S.Ct. 1108, 1114, 75 L.Ed.2d 96 (1983); *Friedman*, 312 N.W.2d 585. *See likewise Bird v. Rothman*, 128 Ariz. 599, 627 P.2d 1097 (Ariz.App.1981) and *Brody v. Ruby*, 267 N.W.2d 902 (Iowa 1978).

This is not a suit by one litigant against the attorney for the opposing litigant. This is an ex parte contact and negotiation of an unconscionable contract by convincing Patricia Brooks to exclude her attorney. We cannot compare what Zebre, as a lawyer, did with a doctor upset that a lawyer represented a former patient in an unsuccessful medical malpractice lawsuit. *Friedman*, 312 N.W.2d 585. This is not a case addressing the protected right of a citizen to have access to the courts. *Tappen v. Ager*, 599 F.2d 376 (10th Cir.1979); *Bickel v. Mackie*, 447 F.Supp. 1376 (N.D. Iowa 1978); *Hill v. Willmott*, 561 S.W.2d 331 (Ky.App.1978); *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 750 P.2d 118 (1988); *Drago v. Buonagurio*, 46 N.Y.2d 778, 413 N.Y.S.2d 910, 386 N.E.2d 821 (1978).

This is also not a case of an unrepresented party being misled by what an attorney told his own client. These third-party reliance cases are addressed in *Vanguard Production, Inc. v. Martin*, 894 F.2d 375 (10th Cir.1990); *First Florida Bank v. Maximum Mitchell & Co.*, 558 So.2d 9 (Fla.1990); *Harris v. Bonacci*, 109 A.D.2d 1072, 487 N.Y.S.2d 224, *aff'd* 65 N.Y.2d 876, 493 N.Y.S.2d 309, 482 N.E.2d 1225 (1985); Restatement (Second) of Torts, § 552 (1977). This is the third-party beneficiary concept as a contractual status creating an enforceable duty to the third party. This concept follows the doctrine of *Ultramares Corporation v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) from which *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922) followed and to be now applied to attorneys in *Vereins–Und Westbank AG v. Carter*, 691 F.Supp. 704 (S.D.N.Y.1988). *See also Flaherty*, 492 A.2d 618 and Note, *Attorney Liability to Third Parties For Corporate Opinion Letters*, 64 B.U.L.Rev. 415 (1984).

The adversary-non adversary dichotomy in litigative activities must be recognized. *Pelham v. Griesheimer*, 92 Ill.2d 13, 64 Ill.Dec. 544, 440 N.E.2d 96 (1982); ABA/BNA, *Lawyers' Manual on Profes-*

sional Conduct, Current Reports at 413 (December 20, 1989). The adversarial process in law requires two attorneys, each representing a party, pitted against one another. A like responsibility was found for the attorney's obligation to a buyer when he, as seller's attorney, failed to provide a proper acknowledgement on the deed of conveyance, Collins, 750 S.W.2d 737, and when the attorney for the collection agency that owed a duty to the account assignor negligently failed to pursue the collection, Donald v. Garry, 19 Cal. App.3d 769, 97 Cal.Rptr. 191 (1971). The key to the establishment of a duty is expected reliance. That is the case here. Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, 57 Cal.App.3d 104, 128 Cal.Rptr. 901 (1976), duty to reveal business entity status of partnership to lender; Stewart v. Sbarro, 142 N.J.Super. 581, 362 A.2d 581 (1976), the duty undertaken that initiates consideration of liability for negligent performance. The required performance is use of ordinary skill and knowledge, Eisenberg v. Gagnon, 766 F.2d 770 (3rd Cir. 1985), securities selling, attorney had economic interest in the operation; Bradford Securities Processing Services, Inc. v. Plaza Bank and Trust, 653 P.2d 188 (Okl. 1982), bond counsel attorney's opinion; Rizzo v. Haines, 520 Pa. 484, 555 A.2d 58 (Pa.1989).

We deal here with what Zebre told Patricia Brooks in regard to her need for independent advice, Crutchley v. First Trust and Savings Bank, 450 N.W.2d 877 (Iowa 1990), in a transaction which she obviously did not understand and in which was, by any circumstance of normal real estate sales, patently fraudulent in perspective and effect. Greycas, Inc. v. Proud, 826 F.2d 1560 (7th Cir.1987). See the example given in Harad v. Aetna Cas. & Sur. Co., 839 F.2d 979 (3rd Cir.1988). There is no subjective good faith excuse for attorney negligence. An attorney in Wyoming is held to the standard of care which would be exercised by a reasonably prudent attorney. Bobbitt v. Weeks, 774 S.W.2d 638 (Tex.1989). As discussed in the next section, this includes ethical conduct which relates to standards of care and performance. Elementary principles developed in medical malpractice cases are equally applicable to the attorney's standard of care. What is expected of the medical profession should also be provided by the legal profession. Cleckner v. Dale, 719 S.W.2d 535 (Tenn.App.1986); Ward, Developments in Legal Malpractice Liability, 31 S.Tex.L. Rev. 121 (1990); Comment, Evidence— Cleckner v. Dale: Admissibility of Expert Testimony on Standard of Care in Legal Malpractice Cases, 18 Mem.St.U.L.Rev. 555 (1988). "The law of professional malpractice should be uniform, unless it can reasonably be shown that one profession is more deserving of protection than another for valid policy or social reasons." Ward, supra, 31 S.Tex.L.Rev. at 142–43.[10]

The district court characterized the understanding that Patricia Brooks had about the transaction, which she called a lease, and what the Arambels booked out as a purchase when it stated in decision letter:

> I am convinced, under the circumstances, that the contract was so one-sided as to be oppressive; that the sellers were deprived of meaningful choice; that there was no real opportunity for meaningful negotiation; that there was such gross inequality of bargaining power that fair negotiations were not possible for the estate, that Mrs. Brooks was in

**10.** Compare the statement in the conclusion, to be applied here, in Cifu, Expanding Legal Malpractice to Nonclient Third Parties—At What Cost?, 23 Colum.J.L. & Soc.Probs. 1, 24 (1989):

> Limiting malpractice liability to an attorney's own client will encourage better lawyering and will avoid many ethical and practical problems. This rule will force third parties to retain their own counsel to zealously represent their interests, rather than relying upon the attorneys for an adverse party.

See also Ellmann, Lawyering For Justice in a Flawed Democracy, 90 Colum.L.Rev. 116 (1990). It is accurate to assess that today no longer is it true "the lawyer's enterprise had remained virtually an island in negligence law." Probert & Hendricks, Lawyer Malpractice: Duty Relationships Beyond Contract, 55 Notre Dame Law. 708, 708 (1980).

fact uneducated, intellectually illiterate, and the type of person easily deceived and susceptible of being taken advantage of; and that Mrs. Brooks did not comprehend and was not knowledgeably aware of the contents of the contract and its effect on her and her children. I doubt that even today she is fully aware of its terms, despite it having been explained to her as often as it has.

Not only do the authorities cited by the majority not countenance attorney performance of this type, but the extensive case law provides no example that would lend justification in these facts for immunity from responsibility by the attorney. *Cf. Day v. Rosenthal*, 170 Cal.App.3d 1125, 217 Cal.Rptr. 89 (1985) and *Munson v. Linnick*, 255 Cal.App.2d 589, 63 Cal.Rptr. 340 (1967). There is no automatic immunity for attorneys from their tortious conduct. *Havens v. Hardesty*, 43 Colo.App. 162, 600 P.2d 116 (1979). *See also* Comment, *Attorney Malpractice: Use of Contract Analysis to Determine the Existence of an Attorney–Client Relationship*, 63 Minn.L. Rev. 751 (1979) and Note, *Attorney's Liability to Third Parties for Malpractice: The Growing Acceptance of Liability in the Absence of Privity*, 21 Washburn L.J. 48 (1981).

*National Sav. Bank of District of Columbia v. Ward*, 100 U.S. 195, 25 L.Ed. 621 (1879), serving as the ancestor of lawyer immunity, cannot be applied here. *Ward* was a privity case and very clearly recognized that cases where fraud or collusion are alleged and proved are exceptions to the non-liability privilege. Here, for the Brooks estate, where the transactional incidents sound in fraud and collusion, there is no precedential relevance from *Ward* to be derived. "[W]here there is neither fraud or collusion nor privity of contract, the party will not be held liable, unless the act is one imminently dangerous to the lives of others or is an act performed in pursuance of some legal duty." *Id.* 100 U.S. at 206. Conversely, that court recognized in citing *Langridge v. Levy*, 4 Mee. & W. 337:

> [T]hat as there is fraud and damage the result of that fraud, not from an act remote and consequential, but one con-templated by the defendant at the time as one of the results, the party guilty of the fraud is responsible to the party injured.

*Ward*, 100 U.S. at 206. "Where there is fraud or collusion, the party will be held liable even though there is no privity of contract." *Id.* at 205.

*Ward* only wrote the title opinion for the buyer and not for the funding bank. Privity or its absence has no relation to this transaction where the challenged conduct was directly between the attorney and the defrauded listener. Cf. Symposium, *Attorney's Liability in Title Examination*, 6 Wyo.L.J. 177, 181 (1952) (citing *Glanzer*, 135 N.E. 275, for a duty derived from representation of fact with expectable reliance). The reliance criteria was recognized in the name case, *Williams v. Polgar*, 391 Mich. 6, 215 N.W.2d 149 (1974), which incidently cited Symposium, *supra*, 6 Wyo.L.J. 177, in following Judge Cardozo's opinion in *Glanzer* for abstractor liability. Michigan had categorically eliminated the requirement of privity. *Williams*, 215 N.W.2d at 153. *See also Lawall v. Groman*, 180 Pa. 532, 37 A. 98 (1897), where an attorney title examiner for the borrower was involved with a suit by the lender. In *Stinson v. Brand*, 738 S.W.2d 186 (Tenn. 1987), the court adopted Restatement (Second) of Torts, *supra*, § 522 in perceiving possible negligence from failure to tell elderly vendors who relied on them that a mortgage interest upon sale reflected by the mortgage should be recorded. The New Mexico court similarly applied Restatement (Second) of Torts, *supra*, § 522 to a misconceived real estate transaction to provide a viable case against the participating lawyer in *Holland v. Lawless*, 95 N.M. 490, 623 P.2d 1004 (1981).

A uniform thread in those jurisdictions which abjured limiting liability by privity is that responsibility still depends on an examination of the transaction. *Cornell v. Wunschel*, 408 N.W.2d 369 (Iowa 1987). Cf. *Landrigan v. Nelson*, 227 Neb. 835, 420 N.W.2d 313 (1988) and *Ames Bank v. Hahn*, 205 Neb. 353, 287 N.W.2d 687 (1980), where the court recognized the facts

and circumstance test but declined factual application in a negligently prepared will case. The bad will cases initiated from California decisions in *Lucas v. Hamm*, 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685 (1961) and *Biakanja v. Irving*, 49 Cal.2d 647, 320 P.2d 16 (1958). *See also Heyer v. Flaig*, 70 Cal.2d 223, 74 Cal.Rptr. 225, 449 P.2d 161 (1969) and ABA/BNA, *supra*, at 365. The thesis of the will cases sounded in a third-party beneficiary concept of contract as a recognized duty of the drafter to the anticipated beneficiaries whose interest was explicit in the testator's employment of the lawyer. *Walker v. Lawson*, 526 N.E.2d 968 (Ind.1988). Similarly, inducement and reliance cases run the gamut from title opinions to probate related activities. *Greycas, Inc.*, 826 F.2d 1560; *Fickett*, 558 P.2d 988; *Hermann v. Frey*, 537 N.E.2d 529 (Ind.App.1989); *Cornell*, 408 N.W.2d 369; *Elam v. Hyatt Legal Services*, 44 Ohio St.3d 175, 541 N.E.2d 616 (1989) (distinguishing *Simon v. Zipperstein*, 32 Ohio St.3d 74, 512 N.E.2d 636 (1987), where privity denied liability in a negligently drafted will lawsuit by a beneficiary). *See likewise Licata v. Spector*, 26 Conn.Supp. 378, 225 A.2d 28 (1966), privity defense rejected and *Guy v. Liederbach*, 279 Pa.Super. 543, 421 A.2d 333 (1980), *aff'd in part and rev'd in part* 501 Pa. 47, 459 A.2d 744 (1983).[11] *See also Auric v. Continental Casualty Co.*, 111 Wis.2d 507, 331 N.W.2d 325 (1983). *Cf. Green Spring Farms v. Kersten*, 136 Wis.2d 304, 401 N.W.2d 816 (1987). *Contra Berry v. Dodson, Nunley & Taylor P.C.*, 717 S.W.2d 716 (Tex.App. 1987), restating the present rule requiring absolute priority. *See Berry v. Dodson, Nunley & Taylor, P.C.*, 729 S.W.2d 690 (Tex.1987).

Certainly the granting of a writ of error is not a conclusive indication that the Texas Supreme Court was ready to abandon the privity requirement. It

does indicate, however, that the court was prepared to re-examine the present state of the law in the face of a very sympathetic factual setting for the injured plaintiffs. In the future, courts of appeals dealing with this question should consider the fact that a writ of error was granted on the isolated issue of privity as a bar to *intended beneficiaries* and the fact that a decision was preempted by settlement.

Baron, *The Expansion of Legal Malpractice Liability in Texas*, 29 S.Tex.L.Rev. 355, 361 (1987) (emphasis in original). The direction was preordained by the accounting case of *Shatterproof Glass Corporation v. James*, 466 S.W.2d 873 (Tex.Civ. App.1971), where Restatement (Second) of Torts, *supra*, § 522 was applied. *See* Ward, *Legal Malpractice in Texas*, 19 S.Tex.L.J. 587, 611 (1978).

However, the injured third party plaintiff may well have valid arguments for bringing a legal malpractice case. If it is *foreseeable* that a third party will rely on the work of an attorney, then the general principles of tort law suggest that the innocent party should not bear the full loss proximately caused by the negligence of an attorney. To hold otherwise would be inequitable to foreseeable third parties and would fail to deter negligence in such instances, having an overall negative effect on the reputation of the legal profession.

* * * Under *Shatterproof*, the demise of the privity defense appears imminent in actions by third parties who were foreseeable beneficiaries of and/or justified in reliance on the negligent work of an attorney.

*Id.* at 610–11 (emphasis in original and footnotes omitted). Comment, *Lawyers' Negligence Liability to Non–Clients: A Texas Viewpoint*, 14 St. Mary's L.J. 405 (1983).

---

11. If the attorney who represents the estate can be liable to the beneficiaries of the estate for negligence, the attorney who participates in commission of a fraud against the estate by excluding the estate's attorney should also be liable to the beneficiary.

Nebraska appears as one of the strongest remaining hold outs in preservation of a privity

non-liability rule to the damaged beneficiaries when a will was negligently prepared. *St. Mary's Church of Schuyler v. Tomek*, 212 Neb. 728, 325 N.W.2d 164 (1982). *Ames Bank*, 287 N.W.2d 687 held there was no duty to the guarantors for his client. *Landrigan*, 420 N.W.2d 313.

Also relating generally to the sphere of liability of the attorney to the non-client are the false arrest and malicious prosecution cases as again within a category of facts and circumstances defined within a theory of tort, a zone of duty contrasted with any contractual theory. *Havens,* 600 P.2d 116; *Pomeranz v. Class,* 82 Colo. 173, 257 P. 1086 (1927); *Vernes v. Phillips,* 266 N.Y. 298, 194 N.E. 762 (1935); *Yahola v. Whipple,* 189 Okl. 583, 118 P.2d 395 (1941). These cases are founded on an independent tort concept, wrongful attachment theory. *Home Budget Loans, Inc. v. Jacoby & Meyers Law Offices,* 207 Cal.App.3d 1277, 255 Cal.Rptr. 483 (1989); *Carney v. Rotkin, Schmerin & McIntyre,* 206 Cal.App.3d 1513, 254 Cal.Rptr. 478 (1988); *Munson,* 63 Cal.Rptr. 340; *Penalber v. Blount,* 550 So.2d 577 (La.1989); *Schierloh v. Kelly,* 253 A.D. 373, 2 N.Y.S.2d 188 (1938); *Gibson v. Holmes,* 78 Vt. 110, 62 A. 11 (1905).

For summary judgment review purposes, Zebre knew Patricia Brooks served as an officer of the court as an executor and trustee at the time of these negotiations. *Fickett,* 558 P.2d 988. In August 1983, she had no definable interest for which she had an appropriate right of negotiation. Consequently, the conduct of Zebre in ex parte contact with her was especially egregious since not only involving a fraud perpetrated upon the court process, but also against the minor children who were heirs of the estate.[12] That burden of misconduct was magnified not only by the negative misfeasance of direct contact, but by the affirmative behavior of aggressively advising a represented person not to see that person's attorney at a time when a fraudulent and unconscionable agreement was being prepared. *Greycas, Inc.,* 826 F.2d at 1565 (quoting *Penrod v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 68 Ill.App.3d 75, 81–82, 24 Ill.Dec. 464, 469, 385 N.E.2d 376, 381 (1979)) states the proposition as:

"[O]ne who in the course of his business or profession supplies information for the guidance of others in their business transactions" is liable for negligent misrepresentations that induce detrimental reliance.

Like *Greycas, Inc.* in that case in regard to the third party, Zebre here "used no care." Here also, there can be no doubt about the casual relationship between the misrepresentation and the sale completion and consequent estate loss. *Greycas, Inc.,* 826 F.2d at 1565. The Brooks–Zebre relationship is similar to *Krahn v. Kinney,* 43 Ohio St.3d 103, 538 N.E.2d 1058 (1989), where Krahn actually thought she was being represented but the attorney failed to communicate a favorable plea bargain because of the effect on his real client.

A somewhat similar transactional scenario occurred in *Hill v. Okay Const. Co., Inc.,* 312 Minn. 324, 252 N.W.2d 107 (1977), where one lawyer represented both the buyer and the seller in a sale of a business. When problems developed following "sale," one party claimed intent to have a secured loan which was instead prepared as a sale. Expert testimony at trial contended negligence in the joint representation and in the result of the joint representation as an unsatisfactory sale documentation. The appellate court held the attorney liable for buyer's losses following purchase and the attorney fees incurred by both the buyer and the seller in defending claims of creditors. The principles followed in *Hill* can apply to Brooks where third-party counsel was excluded by Zebre from the negotiations.

**C. Rules of Professional Responsibility**

In the preamble to Wyoming's Rules of Professional Conduct for Attorneys at Law, there is required among other responsibilities:

■ A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice.

\* \* \* \* \* \*

■ A lawyer's responsibilities as a representative of clients, an officer of the legal system and a public citizen are

---

**12.** "There will always be those lawyers who negligently [or tortiously] perform their services, and it is those persons, rather than innocent third parties, upon whom courts are beginning to place the loss· for the lawyer's negligence." Note, *supra,* 21 Washburn L.J. at 71.

usually harmonious. Thus, when an opposing party is well represented a lawyer can be a zealous advocate on behalf of a client and at the same time assume that justice is being done. So also, a lawyer can be sure that preserving client confidences ordinarily serves the public interest because people are more likely to seek legal advice, and thereby heed their legal obligations, when they know their communications will be private.

■ In the nature of law practice, however, conflicting responsibilities are encountered. Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system and to the lawyer's own interest in remaining an upright person while earning a satisfactory living. The Rules of Professional Conduct prescribe terms for resolving such conflicts. Within the framework of these Rules many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the Rules.

\*　\*　\*　\*　\*　\*

■ The legal profession's relative autonomy carries with it special responsibilities of self-government. The profession has responsibility to assure that its regulations are conceived in the public interest and not in furtherance of parochial or self-interested concerns of the bar. Every lawyer is responsible for observance of the Rules of Professional Conduct. A lawyer should also aid in securing their observance by other lawyers. Neglect of these responsibilities compromises the independence of the profession and the public interest which it services.

■ Lawyers play a vital role in the preservation of society. The fulfillment of this role requires an understanding by lawyers of their relationship to our legal system. The Rules of Professional Conduct, when properly applied, serve to define that relationship.

Provisions of the Rules of Professional Conduct for Attorneys at Law further include:

### Rule 4.1. Truthfulness in statements to others.

In the course of representing a client a lawyer shall not knowingly:

(a) make a false statement of material fact or law to a third person; or

(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.

### Rule 4.2. Communication with person represented by counsel.

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.[13]

This court has not always discounted the rules of professional conduct to determine

---

13. I do not accept the limited efficacy ascribed to the cannons of conduct after adoption by this court as ascribed by Wolfram, *The Code of Professional Responsibility as a Measure of Attorney Liability in Civil Litigation,* 30 S.C.L.Rev. 281 (1979).

A legal savant has been quoted as saying that the lawyer obtains as much precise direction from his guide to professional responsibility as a heart surgeon could usefully derive from an examination of a valentine. *Id.* at 281. I prefer his conclusion:

As the preceding sections have attempted to demonstrate, misalignments exist between the scope of an attorney's responsibilities under the Code of Professional Responsibility and the attorney's more limited liability under private law. The judicial expansion of attorney liability proposed in this article is hardly gratuitous, but is impelled by both strong theoretical considerations and the vital practical goal of enhancing enforcement of the Code of Professional Responsibility. To date, the judicial response to opportunities for this kind of enhanced enforcement of the Code has been, frankly, too grudging. \* \* \* But it is believed that pressures from the public and from within the legal profession for higher standards, better articulated and more effectively enforced, may well prevail. *Id.* at 319. *Cf.* Medina & Coyle, *Texas Disciplinary Rules of Professional Conduct: Additional Liability for Texas Lawyers?,* 21 St. Mary's L.J. 733 (1990). See an expressive and thoughtful consideration in Greengard, *Lawyer Discipline Today,* 17 Barrister 11, 36 (Spring 1990), which

acceptable conduct of attorneys relating to civil litigation. In *Kath v. Western Media, Inc.*, 684 P.2d 98 (Wyo.1984), we vitiated a compromise settlement which was, in effect, fraudulently obtained by counsel's concealment of certain file correspondence. In announcing that decision, this court quoted from Judge Rubin in *A Causerie on Lawyers' Ethics in Negotiations*, 35 La.L. Rev. 577, 589–90 (1975):

"If he is a professional and not merely a hired * * * hand, the lawyer is not free to do anything his client might do in the same circumstances. The corollary of that proposition does set a minimum standard: the lawyer must be at least as candid and honest as his client would be required to be. The agent of the client, that is, his attorney-at-law, must not perpetrate the kind of fraud or deception that would vitiate a bargain if practiced by his principal. Beyond that, the profession should embrace an affirmative ethical standard for attorneys' professional relationships with courts, other lawyers and the public: The lawyer must act honestly and in good faith."

*Kath*, 684 P.2d at 101–02.

The hidden conflict relationship which is implicit in the decision in *Kath* is persuasive recognition of a similar responsibility where counsel violates the canons of ethics by arranging for direct negotiations with a person who had an attorney but was unrepresented during negotiations.

Here, however, the distillation of this responsibility is enumerated by the majority:

We turn then to the contention of Brooks and the Bank that they are entitled to a cause of action arising out of an asserted violation of the rules adopted by this court relating to ethical conduct of attorneys. The clear rule is that no private cause of action in favor of a nonclient can be found attributable to violations of the disciplinary rules relating to attorneys.

I strongly dissent from this casual diminution of an attorney's ethical responsibilities. Fraudulent conduct here resulted from intentional violation of the attorney's canon of ethics. One of the oldest precepts recognized by the profession is *"no ex parte contact or negotiation with another lawyer's client."* [14]

*The significant volume of case law presented in the text, law journals, or*

---

concludes with a quote from a Washington legal reform group, "HALT":

"The only thing the public wants is fairness and a feeling that they are being protected from unscrupulous lawyers. That is sorely lacking in the system."

**14.** Ethics violations involving either undisclosed or inadequately protected joint representation cases are well represented in both discipline and liability litigation. Those proceedings surely include significantly less immorality and legal ethics violation than compared to the attorney who knowingly advises a represented third person not to use the assistance of retained counsel so that negotiations can be pursued with the resulting unassisted victim. *Comprehensive case research has not revealed any case which directly includes the impropriety demonstrated here.* However, conflict representation cases where disciplinary action is taken abound. *See* Annotation, *What Constitutes Representation of Conflicting Interests Subjecting Attorney to Disciplinary Action,* 17 A.L.R.3d 835 (1968). *See also,* Annotation, *Malpractice: Liability of Attorney Representing Conflicting Interests,* 28 A.L.R.3d 389 (1969). Recent cases involving property sales or business transactions relating to disciplinary action taken include *In Re Kamp,* 40 N.J. 588, 194 A.2d 236 (1963). In *In Re Kamp,*

the action of the attorney representing the vendor but then purporting to represent the purchaser resulted in a reprimand where the court stated in considering the conflicting representation:

The practice shown by the facts in this case is subversive of the professional relation of attorney and client and cannot be tolerated no matter how widespread it may be. However, under the circumstances, and since this is the first case in which this practice has been brought to our attention, we do not think it appropriate to impose any penalty upon the respondent other than to reprimand him for his conduct. This, however, is not to be taken as a measure of future discipline. The bar will, of course, be upon full notice that the practices here condemned are regarded as highly unprofessional, and any further violations which come to the attention of the court will therefore necessarily be dealt with severely.

*In Re Kamp,* 194 A.2d at 242.

*See Matter of Kali,* 116 Ariz. 285, 569 P.2d 227 (1977), arranging loan between clients without dual notification, DR 5–105(A) through (C) violation, two year suspension; *The Florida Bar v. Clark,* 513 So.2d 1052 (Fla.1987), representing seller and creating the impression of represent-

*cited by the majority does not relate to anything faintly resembling the pernicious impropriety here.* Additionally, more modern cases accord significance and responsibility to canons of ethics as evidence of a standard of duty. An illustration of the reach of the Rules of Professional Conduct 4.2 is found in *Papanicolaou v. Chase Manhattan Bank, N.A.,* 720 F.Supp. 1080 (S.D.N.Y.1989), where an entire law firm was disqualified from further proceedings in an ongoing lawsuit following discussion of the case by firm members with the opposing litigant in the absence of litigant's counsel. That court found the integrity of the litigative process was at stake.

Specifically, Zebre violated his professional responsibility in the following particulars: (1) permitting an unrepresented estate executor to be subjected to ex parte negotiations under his aegis and within his office; (2) participating without arrangement for the attorney of the estate to be present; and (3) advising and counseling the unrepresented individual that the services of her lawyer need not be present while his own client helps negotiate an unconscionable agreement.

It was not just that the result was unconscionable, the action was unconscionable.

*Friedman,* 312 N.W.2d 585 provides no authority on this subject, founded as it is in a litigant suing the opposing attorney in the medical malpractice lawsuit. There is a difference as broad as the Pacific Ocean between the character of cases where a litigant attempts to sue the attorney of the opposing litigant and the case where the

individual is involved in an ostensible joint representation arrangement and is without independent representation. With regard to the opposing attorney litigation in the medical malpractice purview, not only within W.R.C.P. 11, but also by separate statutory enactment, *see* W.S. 1–14–128, Wyoming doctors have unsuccessfully tried to predetermine exposure to litigation. *See likewise Norton v. Hines,* 49 Cal.App.3d 917, 123 Cal.Rptr. 237 (1975) and *Berlin v. Nathan,* 64 Ill.App.3d 940, 21 Ill.Dec. 682, 381 N.E.2d 1367 (1978). The issue is resolved upon the provence of free access to the courts. The discretion to file or not file litigation under the contours of professional ethics provides no comparative authority for ex parte contact with another attorney's client to procure an unconscionable agreement. See likewise, on attacking the attorney of the protagonist for the opposing trial litigant, *Silberg,* 786 P.2d 365; *Hill,* 561 S.W.2d 331; *Brody,* 267 N.W.2d 902; and *Drago,* 386 N.E.2d 821. The only other citation provided by the majority is an absolution of responsibility for harm *caused by* a violation of legal ethics in *Hawkins v. King County, Department of Rehabilitative Services, Division of Involuntary Treatment Services,* 24 Wash.App. 338, 602 P.2d 361 (1979). In *Hawkins,* defendant's criminal defense lawyer received summary judgment when sued for the tort of failure to reveal his client's mental state at bail hearing resulting in assault upon a third party upon the client's release as well as the client's attempted suicide. For various and obvious reasons, the facts of the situation where a confidential communication situation between attor-

ing the buyer, violation of DR 5–105(A) and (B), prior disciplinary problems, now disbarred; *State v. Callahan,* 232 Kan. 136, 652 P.2d 708 (1982), buyer and seller representation, indefinite suspension; *In Re Grorud,* 84 Mont. 221, 275 P. 1098 (1929), representing estate and arranging for sale to a buyer who was a client plus apparently keeping the minimal sales price received "for his own use," one year suspension for involvement in a conflict representation; *In Re Lanza,* 65 N.J. 347, 322 A.2d 445 (1974), representation of both buyer and seller reprimand, DR 5–105 violation; *In Re Conduct of Griffith,* 304 Or. 575, 748 P.2d 86 (1987), complex conflict and other problems in mortgage lending and bank activities, disbarred; *In Re*

*Conduct of Vaile,* 300 Or. 91, 707 P.2d 52 (1985), conflict in representation on business sale, sixty day suspension; *In Re Conduct of Moore,* 299 Or. 496, 703 P.2d 961 (1985), multiple party representation business purchase, two year suspension; *In Re Boivin,* 271 Or. 419, 533 P.2d 171 (1975), buyer and seller representation without adequate disclosure, reprimand; *In Re Hall,* 73 Wash.2d 401, 438 P.2d 874 (1968), vendor school district property sales conflict, disbarred. A litany of twenty-one Oregon conflict representation cases in only seven years was enumerated in *In Re Conduct of Boyer,* 295 Or. 624, 669 P.2d 326 (1983). *See also In Re Conduct of Bishop,* 297 Or. 479, 686 P.2d 350 (1984) and Annotation, *supra,* 17 A.L.R.3d 835.

ney and client existed, fail in relevance here. Self-evident difference should be discerned. Not cited, but similarly postured in a suit against the opposing attorney after the lawsuit was defeated, see *Bob Godfrey Pontiac, Inc. v. Roloff,* 291 Or. 318, 630 P.2d 840 (1981). Cf. *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976).

*Cornell,* 408 N.W.2d 369 provides exhaustive references to the code of professional responsibility in a motel sales transaction. Answering the lawyer's contention that expert testimony was required, the court said:

> The code of professional responsibility clearly requires the attorney to be sensitive to the ethical concerns that arise when the attorney has a financial stake in the transaction or when the attorney represents individuals with differing interests in a transaction. *See Committee on Professional Ethics & Conduct v. Mershon,* 316 N.W.2d 895 (Iowa 1982) (attorney reprimanded for entering into business transaction with client without recommending that client obtain independent advice and without providing full disclosure, even though attorney did not act dishonestly and did not profit on the transaction).

\*   \*   \*   \*   \*   \*

Wunschels also argue that expert testimony was needed to establish a violation of the ethical standards. *See generally* Annotation, *Admissibility and Necessity of Expert Evidence as to Standards of Practice and Negligence in Malpractice Action Against Attorney,* 17 A.L.R.3d 1442 (1968) (expert testimony required to establish standard of care to which attorney's acts are compared). Here, our

code of professional responsibility clearly sets forth the standard of disclosure. It is then the jury's duty, as in a legal malpractice case, to compare the attorney's conduct with the appropriate standard. We conclude the trial court did not err in instructing the jury on the ethical standard clearly announced in Canon 5 of our code of professional responsibility. *Id.* at 378.

There, as here, one party was unrepresented in the negotiations. *Cornell* is, however, not so egregious since at least ex parte avoidance of the client's own attorney in negotiation did not occur. The similarity of failure to disclose did exist. Mengis, *Professional Responsibility,* 50 La.L. Rev. 335, 342 (1989).

Application of the code to joint party relations was addressed in *Lipton v. Boesky,* 110 Mich.App. 589, 313 N.W.2d 163, 166–67 (1981):

> The Code of Professional Responsibility is a standard of practice for attorneys which expresses in general terms the standards of professional conduct expected of lawyers in their relationship with the public, the legal system, and the legal profession. Holding a specific client unable to rely on the same standards in his professional relations with his own attorney would be patently unfair. We hold that, as with statutes, a violation of the Code is rebuttable evidence of malpractice. See *Zeni v. Anderson,* 397 Mich. 117, 129, 243 N.W.2d 270 (1976).

*Brody,* 267 N.W.2d 902, recognized above and cited by the majority, also confined its decision to the circumstances of the case which was a suit against the antagonist's attorney in applying a no-evidence rule.[15] The Montana court, in *Carlson v.*

---

**15.** An interesting anomaly to all of this is provided by *Cross v. American Country Insurance Company,* 875 F.2d 625 (7th Cir.1989), when the attorney sued the insurance company for intentional interference with a contractual relationship by ex parte settlement with the client by whom the attorney had been retained on a contingent fee basis. The attorney received judgment, including punitive damages, after the major defense failed that the written contingent fee agreement did not comply in all regards with a

court-adopted rule. The egregious conduct which produced the compensatory and punitive recovery was action of the insurance adjuster in telling the *represented client*

> that he did not need a lawyer and that litigation takes a long time, the company, acting through its agents, intentionally and maliciously induced him to breach his contractual relationship with Cross. *See [Employers Liab. Assurance Corp. v.] Freeman,* 229 F.2d [547] at 550 [ (10th Cir.1955) ] (court found sufficient

*Morton,* 229 Mont. 234, 745 P.2d 1133 (1987), determined that an expert witness was required under the circumstances. Although, the court added that "[w]hile proof of the violation of some disciplinary rules may by itself establish negligence, such is not the case with the rules cited by [plaintiff]." *Id.* 745 P.2d at 1137. Those claimed disciplinary rule violations were not the direct dealing involved in the Rules of Professional Conduct for Attorneys at Law 4.2 here. The difference has to be recognized between use of ethical code violation to create a private cause of action, *Terry Cove North, Inc. v. Marr & Friedlander P.C.,* 521 So.2d 22 (Ala.1988), and evidence of lack of due care or contractual violation such as the independent tort of fraud or false representation, *Woodruff v. Tomlin,* 616 F.2d 924 (6th Cir.1980); *Crest Investment Trust, Inc. v. Comstock,* 23 Md.App. 280, 327 A.2d 891 (1974). The modern perspective of professional malpractice has expanded to include:

" '1. The employment of the attorney *or other basis for duty;*

2. The failure of the attorney to exercise ordinary skill and knowledge; and

3. That such negligence was the proximate cause of damage to the plaintiff.'

R. Mallen & V. Levit, *Legal Malpractice* 123 (1977)" * * *.

*Guy,* 421 A.2d at 336 (emphasis added and quoting *Schenkel v. Monheit,* 266 Pa.Super. 396, 399, 405 A.2d 493, 494 (1979)). This case involves the other basis for duty created by attorney participation and unethical conduct in negotiating an unconscionable and illegal agreement. *Crutchley,* 450 N.W.2d 877.

Within the summary judgment status, mandatory inferences demonstrate that Zebre undertook to serve in fact as counsel for the estate and Patricia Brooks when he convinced Patricia Brooks to exclude proper counsel. *Fickett,* 558 P.2d 988. The disciplinary review in *Matter of Pappas,*

159 Ariz. 516, 768 P.2d 1161, 1167–68 (1988) (footnote omitted) provides perspective when the Arizona court recognized:

The absence of an articulated attorney-client relationship on this particular transaction does not preclude a finding that respondent was obligated to exercise his professional legal judgment on the Petersons' behalf. Because the Petersons reasonably thought of respondent as their attorney, we find respondent was obligated to behave as their attorney. The existence of an attorney-client relationship depends largely on the client's "belief that it exists." *Louisiana State Bar Ass'n v. Bosworth,* 481 So.2d 567, 571 (La.1986) (citing *Matter of McGlothlen,* 99 Wash.2d 515, 663 P.2d 1330 (1983), and E. Cleary, *McCormick on Evidence* § 88, at 208 (3d ed. [sic] 1972)). Therefore, where a person holds an objectively reasonable belief that a lawyer is acting as his attorney, relies on that belief and relationship, and the lawyer does not refute that belief, we will treat the relationship as one between attorney and client in bar disciplinary matters. *Neville,* 147 Ariz. 106, 708 P.2d 1297. We hold that in the Aloha transaction respondent and the Petersons were in an attorney-client relationship for purposes of the disciplinary rules at issue. We now consider the individual charges against respondent.

*Accord Martin v. Kentucky Bar Association,* 775 S.W.2d 519 (Ky.1989), where one of the bases for the five year suspension from practice was "that he communicated directly with an adverse party on the subject of representation knowing that the adverse party was represented by counsel and without the consent of that counsel, * * *." *Id.* at 519. Recognizing that "[f]raud includes anything calculated to deceive, including the suppression of truth and the suggestion of what is false * * *," *In re Yamaguchi,* 118 Ill.2d 417, 113 Ill.

evidence that insurance company induced breach of contract where insurer's claim adjuster told client that he did not need an attorney and that the company could take care of everything); * * *. Taking the evidence in its entirety, we believe that there

were sufficient facts to enable the jury to conclude that the company obtained a settlement with Patterson by inducing him to abandon his attorney and to settle directly with the company.

*Id.* at 631.

Dec. 928, 931, 515 N.E.2d 1235, 1238 (1987), the *Yamaguchi* court stated:

> The canons of ethics contained in the Code [code of professional responsibility] constitute a safe guide for professional conduct, and an attorney may be disciplined for not observing them.

*Id.* 113 Ill.Dec. at 932, 515 N.E.2d at 1239.

The code of professional responsibility should be enforced. *See Davenport v. State,* 157 Ga.App. 704, 278 S.E.2d 440 (1981), where a criminal conviction was reversed because of the appearance of impropriety from a conflict of interest. For civil representation, see *Crawford W. Long Memorial Hospital of Emory University v. Yerby,* 258 Ga. 720, 373 S.E.2d 749 (1988) where canons of ethics were applied. *Accord Summerlin v. Johnson,* 176 Ga.App. 336, 335 S.E.2d 879 (1985).[16]

In *Raine v. Drasin,* 621 S.W.2d 895, 901 (Ky.1981), which was a successful suit by doctors after dismissal of a malpractice suit against them, expert testimony was permitted by a member of the ethics committee of the bar association:

> Professor Leibson stated that, in his opinion, the actions of both Raine and Highfield did not comply with the standard of care for ordinary and prudent lawyers. Raine complains that the admission was improper. We believe that such evidence was properly introduced to show one of the key ingredients of a malicious prosecution action, viz., lack of probable cause.

The case itself was extraordinarily clear in demonstration of improvident legal practice in pursuing the malpractice suit against the particular doctors who, after dismissal of the suit against them by countersuit, recovered both general and punitive damages in trial court with appeal reversing only the punitive damages for retrial.

Zebre first tried to get employed to prepare Isaac Brook's will and after Isaac's death and commencement of probate, Zebre arranged to exclude the attorney for the estate from negotiations to sell the estate

assets. In *Jenkins v. Wheeler,* 69 N.C. App. 140, 316 S.E.2d 354 (1984), where plaintiff was the sole heir of decedent who, as a passenger, died as a result of an automobile accident with her stepfather as driver. The stepfather renounced administratorship in favor of his *sister* and committed suicide. His sister, no relative of plaintiff, then qualified as administratrix of her brother's estate also. While this was going on, administratrix and her attorney failed or refused to pursue a wrongful death action. Plaintiff sued the administratrix, the attorney and the laid-back insurance company. The attorney was favored by a motion to dismiss at trial court level and the appellate court reversed recognizing the conflict of interest for the attorney to represent both estates and applied criteria of the code of professional responsibility as a basis for liability within a conflict of interest misconduct occurrence. Citing DR 5–105(B) of the Code of Professional Responsibility, the *Jenkins* court said:

> "An attorney's representation of two or more clients with adverse or conflicting interests constitutes such misconduct as to subject him to liability for malpractice, unless the attorney has obtained the consent of the clients after a full disclosure of all the facts concerning the dual representation."
> * * *

Jenkins also alleged that Wilson's legal advice to Ava Wheeler was wrongful and therefore also actionable. We are aware that an attorney acting in good faith and in an honest belief that his or her advice is well-founded is not answerable for mere errors of judgment. * * * However, the complaint in this case alleges not only that Wilson represented conflicting interests but that he was in collusion with the other defendants. Under the circumstances, we hold that plaintiff has adequately pleaded bad faith on Wilson's part. We further conclude that the Complaint makes out a case of negligence

---

**16.** The related subject of the ex parte contact by defense counsel with opposing litigant's physicians has a recent litigative history of considerable attention. *See Duquette v. Superior Court In and For County of Maricopa,* 161 Ariz. 269, 778 P.2d 634 (1989).

against Wilson and should not have been dismissed on that ground.

*Id.* 316 S.E.2d at 358 (citations omitted). R. Wise, *Legal Ethics*, 271 (2d ed. 1970 & 1979 Supp.).

Close analysis of the current case law moving toward the elimination of privity in the tort concept legal malpractice liability factual situation—non-adversary attorney—establishes a *balancing test.* A good discussion is found in a North Carolina case, *United Leasing Corporation v. Miller*, 45 N.C.App. 400, 263 S.E.2d 313, 318 (1980):

> Whether or not a party has placed himself in such a relation with another so that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that the other will not be injured calls for the balancing of various factors: (1) the extent to which the transaction was intended to affect the other person; (2) the foreseeability of harm to him; (3) the degree of certainty that he suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the moral blame attached to such conduct; and (6) the policy of preventing future harm.

I would argue that directly related to moral blame and a comparable policy of preventing future harm is the judiciary's responsibility for the enforcement of the code of professional responsibility. History demonstrates that the private litigant does a far better job of protecting individual rights than ever resulted from action from regulatory agencies of government. This concept is the driving force behind the large number of federal statutes providing for private litigation attorney's fees in enforcement of constitutional and statutory rights including, as examples, 42 U.S.C.A. § 1988, Civil Rights Act, and 28 U.S.C.A. § 2412, Equal Access to Justice Act. This case provides significant witness since whatever may have occurred in regard to

disciplinary proceedings, no substantial disciplinary action has occurred to this date against this attorney for the admitted and documented, deeply serious violation of legal ethics as explicitly provided in the court's own rules adopted to supervise the conduct of lawyers in the practice of law in Wyoming.[17] Although involving direct representation malpractice, *Woodruff*, 616 F.2d at 936 recognized the relationship of the canons of professional ethics to malpractice as defining the scope of a violated duty to the client as "evidence of the standards [of performance] required."

We are invested here with a factual situation providing striking similarities to *Crest Investment Trust, Inc.*, 327 A.2d at 904 (footnotes omitted):

> In the first place, counsel incurs a substantial risk of violation of Canon 5 of the Code of Professional Responsibility and the Disciplinary Rule based on this Canon, DR 5–105. The Canon declares that "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client," and DR 5–105 states that in situations where the exercise of a lawyer's independent professional judgment on behalf of a client is likely to be adversely affected by his representation of another client, the lawyer may represent both clients only "if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

> In addition, when an attorney undertakes dual representation without making the full disclosure required of him, he incurs the risk of civil liability to the client who suffers loss caused by such lack of disclosure. *Lysick v. Walcom*, 258 Cal.App.2d 136, 65 Cal.Rptr. 406 (1968).

17. Challenging and also striking in comprehensive analysis of the eight problems in applied legal ethics is Miller, *The Standards of Advocacy: Changing Positions in Legal Ethics in the United States*, 16 W.St.U.L.Rev. 461 (1989). The eighth problem stated in analysis *was the judiciary* as emplaced within what the author discerned to be for the most part a self-regulating profession.

Further quoting from *In Re Kamp*, 40 N.J. 588, 194 A.2d 236, 240 (1963), it was recognized that " '[a] conflict of interest is inherent in the relationship of buyer and seller; and [former] Canon 6 is applicable to every occasion in which an attorney undertakes to represent both the seller and the buyer under a sales contract.' " *Crest Investment Trust, Inc.*, 327 A.2d at 905.

*See Albright v. Burns*, 206 N.J.Super. 625, 503 A.2d 386, 389 (1986), which states:

Further, a member of the bar owes a fiduciary duty to persons, though not strictly clients, who he knows or should know rely on him in his professional capacity. * * * We think it follows that privity should not be required between the attorney and one harmed by his breach of duty where the attorney had reason to foresee the specific harm which occurred.

With reference to the violation of ethical standards, the New Jersey court stated the more pervasive modern rule of responsibility:

Poe urges that a violation of ethical standards is not tantamount to tortious conduct, particularly with regard to liability to a non-client. * * * While violations of ethical standards do not *per se* give rise to tortious claims, the standards set the minimum level of competency which must be displayed by all attorneys. * * * Where an attorney fails to meet the minimum standard of competence governing the profession, such failure can be considered evidence of malpractice. * * *

While the burden of proving proximate causation between the breach of duty and the loss is upon plaintiffs, we think it clear Poe's conduct aided in divesting Bruch's estate of its most important asset. * * *

Plaintiffs' proofs give rise to an inference of malpractice by Poe. Dismissal was unwarranted.

*Id.* 503 A.2d at 390–91. *See likewise Crutchley*, 450 N.W.2d 877.

The New Jersey Supreme Court in *Haynes v. First National State Bank of New Jersey*, 87 N.J. 163, 432 A.2d 890, 899–900 (1981) (footnotes omitted) similarly addressed the conflict danger in will preparation when presenting one of several errors:

It is not difficult to appreciate the policy reasons for creating an especially strong presumption of undue influence in cases of attorney misconduct. Such professional delinquency is encompassed by our official rules governing the professional ethics of attorneys. Our disciplinary rules cover all gradations of professional departures from ethical norms, and, the existence of an ethical conflict exemplified in this case is squarely posited under DR 5–105. * * *

* * * * * *

So pervasive and fundamental is the ethical reach of DR 5–105 that ethical violations of this disciplinary rule based upon conflicts of interest have been found in a myriad of situations and in almost every walk of professional life. Such conflicts often arise where there is dual representation. * * * A conflict of interest, moreover, need not be obvious or actual to create an ethical impropriety. The mere possibility of such a conflict at the outset of the relationship is sufficient to establish an ethical breach on the part of the attorney.

*See likewise Gillespie v. Klun*, 406 N.W.2d 547 (Minn.App.1987) in representing both buyer and seller in an apartment deal with resulting jury verdict for compensatory damages, emotional distress and punitive damages awarded to the buyer after defaulting on the contract in attempting to rescind.

The rule in *Fishman v. Brooks*, 396 Mass. 643, 487 N.E.2d 1377 (1986) is applicable here where avoidance of conflict representation and forbearance of direct negotiations of a represented individual is intended to protect the potential victim from fraud, overreaching or execution of a unconscionable contract. The Massachusetts court said:

We add a brief comment about the relationship between the canons of ethics and an attorney's duty of care to his client. A violation of a canon of ethics or

a disciplinary rule * * *, is not itself an actionable breach of duty to a client. * * * As with statutes and regulations, however, if a plaintiff can demonstrate that a disciplinary rule was intended to protect one in his position, a violation of that rule may be some evidence of the attorney's negligence.

*Id.* 487 N.E.2d at 1381.

I do not believe we can ignore violations of ethical responsibilities in assessment of liability for legal malpractice. Modern and predominate case law, well reasoned as it is, sustains my perception.

## V.

## FRAUD

The majority denies that fraud is visible, although many others may see it without squinting, when Zebre convinced Patricia Brooks to rely on his advice that she need not consult the estate attorney and then secured her signature to an unconscionable sales contract. Fraud is not one of those elusive concepts.

> An intentional perversion of truth [*you do not need to consult your attorney because I would not cheat you* ] for the purpose of inducing another in reliance [*trust me* ] upon it to part with some valuable thing [*a ranch and an inheritance* ] belonging to him or to surrender a legal right.[18]

18. Blacks Law Dictionary 584 (5th ed. 1979).

19. A similar characterization would apply to defendant's contention of inadequate pleading of fraud where the defense was characterized by the court to be "an attempt to distract the court from seeing the forest by showing it the trees." *Raymark Industries, Inc.,* 714 F.Supp. at 467. The attorney's representation of a viable claim when he had manufactured the allegations and proposed supporting evidence has similar attributes to the statement that a distraught woman does not need independent counsel in selling a large ranch estate or in accepting an unconscionable proposal while serving in a fiduciary capacity. In *Raymark Industries, Inc.,* 714 F.Supp. at 467 n. 1, the trial court, in discussing the code of professional responsibility, related:

> [T]he court is convinced that the entire course of conduct, as alleged in plaintiff's complaint, is relevant here. If such lawyers will so willingly defy their professional code of conduct,

*See Raymark Industries, Inc. v. Stemple,* 714 F.Supp. 460 (D.Kan.1988).[19] *See also Jeska v. Mulhall,* 71 Or.App. 819, 693 P.2d 1335 (1985).

My analysis first recognizes that this was not a pleading issue in district court. Significant differences in adaptation and application of the motion to dismiss, W.R. C.P. 12(b)(6), as different from summary judgment, W.R.C.P. 56, should be first noted. Dismissal under W.R.C.P. 12(b)(6) without leave to amend should never be granted unless there are no circumstances in which an amended complaint could be stated which would justify the grant of relief to the pleader. When a case proceeds past the motion to dismiss stage of summary judgment, proper adjudicatory review also proceeds past initial pleading to consider presented facts. *Moss v. Zafiris Inc.,* 524 So.2d 1010 (Fla.1988); *United States Nat. Bank of Oregon v. Fought,* 291 Or. 201, 630 P.2d 337 (1981).

This decision can only be justified if the evidence utilized by the district court for summary judgment fails to present an issue. This case extrudes from facts so reprehensible that precedent can only be developed by analogy. This is a fact case, not a pleading of fraud case in presented posture.

The attorney intentionally violated clear rules of professional conduct. The attorney justified contact with a represented party whose attorney was not advised by

> they will hardly be found to take care as to the propriety of their product. Thus, such acts put in place the basis for a fraud claim. This fraud, as alleged, was not only upon Raymark, but upon this court! A full factual inquiry is clearly necessitated.

See likewise the evidentiary status of the code of professional responsibility in the attorney malpractice negligent misrepresentation case of *Miami Intern. Realty Co. v. Paynter,* 841 F.2d 348 (10th Cir.1988), where a $2.1 million damage award resulted from a real estate transaction. The award against the attorney for malpractice by the trial court was affirmed on appeal.

This case cannot be compared to litigation derived from effective bilateral negotiation where each party was represented by attorneys upon whom they each could rely. *Green Spring Farms,* 401 N.W.2d 816.

assurance of fairness and protection for the unrepresented individual. An unconscionable contract was negotiated. On this summary judgment record, great damage and loss resulted not only to the individual's own interest but to her responsibility as an officer of the court to protect other testamentary beneficiaries in her service as personal representative and co-trustee of the trust. In other words, the attorney conspired, consoled and participated in securing an unconscionable contract which, by excluding the attorney for the estate from negotiations, adversely affected not only the uncounseled person, but also the other heirs and beneficiaries within a pending probate proceeding. *See Raymark Industries, Inc.,* 714 F.Supp. 460.

In unethically excluding counsel, *Crutchley,* 450 N.W.2d 877, and in promising protection and fairness, there was fraud—raw, rank and despicable. The fraud to which the majority seems blind first occurred in negotiations with a represented person constituting an officer of the court in probate and contacted, in the absence of the estate's counsel, for the negotiation of an agreement contrary to normal administrative practices for sale of real estate under Wyoming law. Clearly, this alone should have been sufficient as procedural fraud.

Consideration is then directed to the factors and functions of the transaction that were fraudulent in providing an unconscionable "bargain." Obviously, her trust was misplaced. *Barbara A.,* 193 Cal.Rptr. 422. First, Patricia Brooks was led to believe that the transaction was a lease. After trial, the district court found she never understood the transaction even by that date. Secondly, the transaction was really a sales agreement with option rights and was absolutely unfair to the seller and favorable to the buyer. Imputed interest and rental features provided a tax gold mine to

the buyer and ordinary income to the seller. Third, the price in real valuation was only about twenty-five percent of what Patricia Brooks thought she was receiving and in financing terms could hardly be distinguished from sheer larceny of the ranching enterprise. Fourth, the operational rights of her son on the family ranch were used as a price in negotiation and were overtly without expectable value in procedural application.[20] Fifth, inadequate security was provided for seller's protection to justify the fiduciary responsibility of a personal representative and a co-trustee and within the expectancy of a negotiating party in order to constitute a debt encumbrance to maintain the asset and assure contract fulfillment in regard to both the livestock and the real estate. Sixth, the transaction was not a lease and was not booked out as a lease by the buyer when the property acquisition occurred. It was a long-term sale transaction for both livestock and real property with an opportunity for the buyer to credit payments made as rent or charge them to purchase price and walk away without deficiency at any time during the fifty-two year period of the transaction. Seventh, the so-called down payment was actually funded by a loan against the acquired assets. Eighth, the period of time in itself for the transaction's completion was unconscionable. Ninth, avoidance of interest payments on asset value acquired and payment obligation was fiscally absurd creating a financially phony sales price which fiscal facts were never really understood by the widow. Tenth, the contract was executed in undue haste and was not either explained to or understood by Patricia Brooks. Eleventh, the journeyman technician with reasonable real estate experience could find at least a dozen or perhaps twenty technical or practical

---

**20.** The district court said it well:

Although the contract purports to "protect" Isaac, Jr. by giving him the option of running his 500 A.U.M.'s on the ranch, it is obvious to me that he is not now, nor will he ever able to be, capable of running anything. He is a frail, sickly boy who cannot even walk straight and who appears also mentally retarded, all as a result of his many ailments

and operations. It is difficult, if not impossible, for me to comprehend how anyone with any degree of perspicacity could think otherwise. Frankly, it is questionable that Isaac, Jr. will live long enough to exercise the option, and even the contract recognizes that possibility where it gives the Arambels the right to buy the 500 A.U.M.'s if Isaac, Jr. "does not attain the age of 19 years."

questions about the form, sufficiency and handling of the sales agreement and sales document for this multi-million dollar integrated ranch sale. *See* Appendix "A" attached hereto.

In addition to the overreaching created by the sales document itself, the procedural disregard when one considers the estate status of the transaction is staggering. An appraisal for the estate had not been obtained. Estate and inheritance tax considerations, let alone filed returns, had not been completed. Minor heirs required guardianships or at least guardians ad litem. A court approval would be required for the transaction. A careful inventory and appraisal for sales evaluation purposes was needed to compare the offer to a relevant market. Estate property market conditions and values needed to be explored and established by comprehensive and competent expert appraisal.

None of this occurred in the hastily negotiated, oppressive agreement which was achieved by reliance of the victim on the protection from the attorney who provided an atmosphere of validity to a grossly deceptive process. Zebre was a principal actor and contributor in fulfillment of the transactional misadventure. It is most fitting and just that he should be called to explain to a jury to what degree his conduct did not contribute to causing the contended million dollar loss to the widow and minor children who, without question, were defrauded in the sales transaction by the "friendly, neighbor rancher."

Within these concepts of fraud intrinsic to the process used to acquire the estate and what was provided as terms for acquisition, Wyoming law on fraud is set back by the majority's callous disregard of the obvious and, in many regards, uncontroverted facts.

In *Willmschen v. Meeker*, 750 P.2d 669 (Wyo.1988), the vendors brought action for fraud against a broker. Elements stated in that case are: (1) falsity of the representation; (2) guilty knowledge or scienter; (3) intent to deceive or cause someone to believe the falsehood; (4) reliance on the misrepresentation which induced the seller to act; (5) actual deception; and (6) injury or damage to the person victimized. We have recently stated the concept more simply where evidence of actionable fraud in a car sales transaction is found, including knowingly making a false representation of a material fact with the intent of inducing action and reliance to their detriment and damage. *Britton v. Bill Anselmi Pontiac–Buick–GMC, Inc.*, 786 P.2d 855 (Wyo. 1990). *See also Garner v. Hickman*, 709 P.2d 407 (Wyo.1985) and *Duffy v. Brown*, 708 P.2d 433 (Wyo.1985). This court has further recognized that evidence of any active conduct or words which tend to produce any erroneous impression might sufficiently satisfy the burden if those half-truths had the effect of lies and even if no duty to speak might exist. Once the actor chooses to speak, he becomes obligated to fully and fairly disclose the truth of the matter. *Meeker v. Lanham*, 604 P.2d 556 (Wyo.1979); *Simpson v. Western National Bank of Casper*, 497 P.2d 878 (Wyo.1972); *Twing v. Schott*, 80 Wyo. 100, 338 P.2d 839 (1959). The special responsibility which we attributed to a real estate broker in *Walter v. Moore*, 700 P.2d 1219 (Wyo.1985); *Hagar v. Mobley*, 638 P.2d 127 (Wyo.1981); and *Distad v. Cubin*, 633 P.2d 167 (Wyo.1981), surely, in augmented degree, applies to the high calling of the practicing attorney in professional responsibility to avoid being the handmaiden of the perpetration of fraud on an unrepresented individual. As stated in *Duffy*, 708 P.2d 433, we have here, false information supplied in the course of one's business for the guidance of others in their business and failure to exercise reasonable care in obtaining or relating the information and pecuniary loss resulting from the justified reliance thereon. This case accommodates jury questions of fraud in the process of perpetration and fraud in the object realized by perpetration. Our affirmance of the substantial verdict rendered on the basis of fraud in *Meyer v. Ludvik*, 680 P.2d 459 (Wyo.1984) is in accord but not nearly within a factual circumstance as egregious as are the events occasioned here. *See likewise Hagar*, 638 P.2d 127.

Cases of closest relevance are *Waters v. Trenckmann*, 503 P.2d 1187 (Wyo.1972), a ranch sales transaction where the representations were made by the realtor and the seller was held liable for the fraud and *Simpson*, 497 P.2d 878, where the representations were made by the banker regarding the solvency of the contracting party. Both cases would sustain a fraud complaint in this case within the perspective not only of the procedural fraud, but the substantive, negotiative fraud that occurred here and the unquestioned participation of the attorney in accomplishment. Although intent to deceive must be proven by clear and convincing evidence, appropriate proof of such intent may be inferred from circumstantial evidence. The facts of this transaction speak for themselves. *Broom v. State*, 695 P.2d 640 (Wyo.1985); *In re Kimzey*, 761 F.2d 421, 424 (7th Cir. 1985); *United States v. Mammoth Oil Co.*, 14 F.2d 705 (8th Cir.1926), *cert. granted* 273 U.S. 686, 47 S.Ct. 332, 71 L.Ed. 840, *aff'd* 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137 (1927); *In re Eversole*, 110 B.R. 318, 323 (S.D.Ohio 1990).

The civil fraud case of *Hennigan*, 593 S.W.2d 380 is informative in recognizing where a duty to speak exists, silence may be equally misleading. Here, the fraud began by excluding an attorney from his client who was an officer of the court by virtue of being the personal representative of an estate. The substantive elements of fraud result from the negotiations of the unconscionable contract. It is similar to *Hennigan* where the attorney permitted execution processes to continue after he had already collected. By such misfeasance, the Texas attorney became responsible for damages sustained by the third party as a result of his fraud. In *Hennigan*, 593 S.W.2d at 383, the appellate court considered the appellant's argument:

> Appellant's arguments as we understand them are: (1) If an attorney at law violates his professional responsibility by concealing facts where there is a duty to reveal them, there is no private remedy by way of a cause of action against him for fraud, but rather the remedy is a public one by way of professional discipli-

nary procedures as under the State Bar Act. Appellant has cited us no authority to support such a proposition, and we have found none. We see no reason why an attorney at law could not be held liable for actionable fraud as would anyone else. We reject this argument.

A fraud case was clearly presented here and, in denial of that right to the defrauded estate, the district court and this majority committed a terrible error.

## VI.

## CONCLUSION

We leave this case as we began. A grossly unconscionable contract was negotiated with an untrained, modestly educated, recently widowed woman after she was talked into excluding her attorney. A direct participant was an attorney who purported to protect her in a hurriedly negotiated transaction while violating fundamental professional ethics by ensuring that her attorney, who could have protected the widow, was not available. The majority is totally wrong in all three major conclusions utilized to deny relief to the defrauded estate—(1) a privity defense; (2) non-application of ethical responsibilities to a duty of care; and (3) proper presentation of a fraudulent claim. Contrary to statements made by Zebre's counsel at oral argument before this court (whether actually representing his interest or otherwise) that justice should be found through disciplinary proceedings (which could include disbarment), I see in this case a responsibility for compensation in damage done. Anything else is not real justice to the defrauded estate and its beneficiaries and, consequently, I most strongly and with great anguish dissent.

## APPENDIX A

### EXHIBIT 1

MEMORANDUM CONTRACT OF SALE AND LEASE AGREEMENT WITH OPTION TO PURCHASE

THIS Memorandum Contract of Sale and Lease Agreement with Option to Purchase

made this 12th day of August, 1983, by and between Patricia A. Brooks, as an individual; Patricia A. Brooks, as personal representative of the estate of Isaac N. Brooks; and Patricia A. Brooks and Saima McCurtain, as trustees of the trusts established under the Last Will and Testament of Isaac N. Brooks, hereinafter referred to as sellers, lessors and/or optionors, and John F. Arambel and Peter R. Arambel, hereinafter referred to as buyers, lessees and/or optionees, all of Rock Springs, Sweetwater County, Wyoming.

IT IS MUTUALLY UNDERSTOOD AND AGREED THAT:

The covenants herein contained shall bind, and the benefits and advantages thereof shall inure to, the respective heirs, devisees, legatees, executors, administrators, successors and assigns of the parties hereto. Whenever used the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

## SALE OF LIVESTOCK

1. Sellers herein agree to sell and buyers agree to buy certain livestock owned by the sellers identified as follows: Commencing on approximately September 15, 1983, the buyers will assist the sellers in the round-up, handling, and culling of all livestock presently owned by sellers, commonly known as all of that livestock involved in the Isaac N. Brooks ranching operation. Sellers will sell pursuant to said handling operations with the assistance of the buyers all of this year's calf and lamb crop, together with all culled livestock, and shall retain all sale proceeds therefrom.

2. All remaining livestock shall be purchased by the buyers for the then market value of the same, said market value being determined by the price that buyers receive from the sale of the livestock presently owned by the Circle L ranching operation owned by buyers. The purchase price for said livestock purchased from sellers by buyers shall be paid to the sellers over a 10-year period in 10 equal annual pay-

ments with the first of such annual payments being due to sellers on December 1, 1984.

3. It is understood that of the $50,000.00 initial deposit and payment made with this agreement, $10,000.00 of the same is hereby allocated as earnest money toward the purchase of said livestock. It is mutually and expressly understood and agreed that the indebtedness of the buyers to the sellers for the purchase of said livestock and the installment payments made pursuant thereto shall not bear interest.

## LEASE

1. The lessors, as the same are identified in the introductory paragraph hereto, for and in consideration of the covenants herein contained, hereby demise and lease to the lessees all of the real property and real property interests of whatsoever kind and character presently owned by or known as the Isaac N. Brooks ranching operation, together with all improvements and appurtenances, all water and/or ditch rights, and all equipment, trucks, machinery, tools, saddlery and tack presently involved with or associated with said ranching operation, save and except that white Chevrolet 1-ton truck presently utilized by Dean Smith, as the foreman and superintendent of said ranching operation, and also together with all deeded lands, all state and/or federal leases, and private and/or corporate leases, to include sellers', lessors' and optionors' shares in the Rock Springs Grazing Association, all of which property is situate in Sweetwater County, Wyoming. This description is not meant or intended to include any non-agricultural property located within municipal limits of Rock Springs, Wyoming, but does include any and all buildings, structures, residences or appurtenances situate on or about the aforementioned and described agricultural lands. Sellers reserve any and all mineral rights and royalties.

2. It is mutually understood and agreed between the parties hereto that the exact legal description of said tracts herein leased shall be determined by buyers and sellers, at the expense of buyers, obtaining

a title search from Wyoming Land Title Company of the records of any appropriate federal or state agency or entity. It is expressly understood and agreed that the above and aforementioned inventory approach is taken only because of the extensive size and nature of the land holdings, and not because sellers or buyers are unaware of the exact lands being leased herein.

3. The term of the aforementioned lease shall be from November 1, 1983, for a period of 40 years, up through and including October 31, 2023. The lease payments pursuant hereto shall be paid as follows:

a. For the first 5 years in the amount of $43,750.00 per year, payable on December 1, 1984, and on the 1st day of December of each and every year thereafter for a total period of 5 years.

b. For the next 30 years in the amount of $87,500.00 per year, payable on December 1, 1989, and on the 1st day of December of each and every year thereafter for a total period of 30 years.

c. For the last 5 years of said lease in the amount of $131,250.00, payable on December 1, 2019, and on the 1st day of December of each and every year thereafter for a total period of 5 years when said lease amount shall have been paid in full, subject, however, to the provisions of the option hereinafter recited.

4. It is understood and agreed between the parties hereto that of the $50,000.00 deposit and initial payment made herewith that the sum of $20,000.00 shall be considered as consideration for the execution of said lease agreement.

## OPTION TO PURCHASE

1. The optionors and optionees, as identified in the introductory paragraph hereto, hereby mutually and expressly agree, in exchange for their mutual promises and covenants and the balance of $20,000.00 remaining consideration paid herewith, that the optionors hereby grant to the optionees an exclusive option to purchase all of the lands hereinabove described as being sub-

ject to the lease provisions of this agreement by notifying the optionors of optionees intention to so purchase the same. In the event said option is exercised, the optionees shall give the optionors notice of the same in writing. In the event said option is exercised, it is agreed that the purchase price for the same shall be in the amount of $3,500,000.00, which will be paid by the optionees to the optionors and sellers in the same amount, manner and rate and on the same schedule as the lease payments made hereunder, and optionees shall be accorded credit against the purchase price thus paid for all lease payments made to the lessors prior to the exercise of said option, it being understood and agreed that the total of said lease payments over a 40-year period is equal to the total consideration in the event of exercise of said option in the amount of $3,500,000.00. In the event said option is exercised, the remaining payments to be made toward payment of the full purchase shall also be without interest. It is further mutually and expressly understood and agreed that in addition to the credits previously referred to hereinabove the initial payment and deposit made contemporaneously with the execution of this agreement shall be credited towards the payment of the purchase price by deducting the same amount from the last payment due and owing to sellers in the year 2023, notwithstanding any provision to the contrary herein.

2. It is mutually and expressly understood and agreed between the parties hereto that the purchase price for said ranching operation of $3,500,000.00 has been determined at the rate of $2,000.00 per 1,750 animal units, with the sellers and optionors having retained the right for Isaac N. Brooks, Jr., at such time as he shall have attained the age of 19 years and for a period of 3 years thereafter, to exercise the retained right to run and operate 500 animal units on the lands purchased herein by the optionees and/or buyers. In the event Isaac N. Brooks, Jr., exercises his right to run and operate said 500 animal units, the area or areas on which said animal units are run shall be at the discretion of the optionees and buyers herein, and that the

optionees and buyers may elect to simply have said animal units run in common with those of optionees and buyers, it being understood between the parties hereto that the term 500 animal units refers to the ability to run 500 cows year round. In the event the said Isaac N. Brooks, Jr., does not attain the age of 19 years or in the event that he elects not to exercise his right to run said 500 animal unit operation, the optionees herein shall be entitled to purchase said 500 animal units from the optionors for the purchase price of $1,000,-000.00, to be paid to optionors at the rate of $87,500.00 per year, which payments shall be made by the optionees to the optionors commencing December 1, 2024, and thereafter on the 1st day of December of each and every year to and including December 1, 2036.

3. It is further mutually and expressly understood and agreed that until such time as Isaac N. Brooks, Jr., shall have attained the age of 19 years, the lessees, buyers and optionees herein shall be entitled to run and operate the additional 500 animal units at no additional cost, expense or charge to the lessees, optionees, or buyers hereunder.

4. It is mutually and expressly agreed that the estate of Isaac N. Brooks, Sr., is presently believed to be in probate, and that the sellers, lessors and optionors herein will utilize their maximum efforts to direct and obtain any necessary or required and appropriate confirmation of these agreements by the probate court having appropriate jurisdiction.

5. The parties to this agreement mutually and expressly contemplate and agree that in the event said option is exercised to purchase the lands described herein, it being the understanding of the parties that it is the intent of the optionees to do so, this memorandum contemplates and envisions the execution and delivery into escrow of all appropriate warranty deeds, assignments of leases, bills of sale, promissory notes, expanded or more elaborate contract documents and any appropriate security instruments and the establishment of a set of escrow instructions to provide for the mutual security of both parties hereto.

6. It is further understood and agreed that the provisions of the lease and option as set forth hereinabove shall include a lease to the lessees or sale to the optionees of all brands and/or earmarks presently involved in said ranching operation, save and except the MU brand, which shall be retained by the sellers, lessors and optionors for the future use of Isaac N. Brooks, Jr., in the event he should exercise his right to run and operate 500 animal units. In the event the option to purchase said 500 animal units is exercised by the optionees, then the MU brand shall be assigned and transferred to the optionees and buyers.

7. Actual possession of the real property, improvements and appurtenances, water and/or ditch rights and all equipment, trucks, machinery, tools, saddlery and tack shall be delivered to buyers, lessees and optionees on November 1, 1983.

8. In the event of buyers', lessees' and optionees' failure to seasonably complete the terms and conditions of this offer, it is mutually agreed that sellers, lessors and optionors may elect to either retain the deposit made herewith as fixed and liquidated damages for buyers', lessees' and optionees' failure to complete the sale as herein provided, or enforce specific performance of this agreement. In the event of sellers', lessors' and optionors' failure to seasonably complete the terms and conditions of this offer, it is mutually agreed that buyers, lessees and optionees may enforce specific performance of this agreement.

SELLERS, LESSORS and OPTIONORS:

/s/ Patricia A. Brooks
Patricia A. Brooks, as an individual

/s/ Patricia A. Brooks
Patricia A. Brooks, as personal representative of the estate of Isaac N. Brooks

/s/ Patricia A. Brooks
Patricia A. Brooks, as a trustee under the Last Will and Testament of Isaac N. Brooks

/s/ <u>Saima McCurtain</u>
Saima McCurtain, as a trustee under the Last Will and Testament of Isaac N. Brooks

## APPENDIX B
### EXCERPT FROM DISTRICT COURT'S DECISION LETTER FILED APRIL 8, 1985

What then is wrong with the contract, if anything?

1. It purports to be a lease. Therefore each lease payment would be treated as ordinary income for tax purposes and if this estate has the income, which it would appear to have by virtue of the lease, it probably would be in a fairly high tax bracket meaning much of the income would go for taxes. The Arambels would be able to deduct all lease payments as business expenses.

2. When the option is exercised, and it was on September 23, 1983, the contract became a contract of sale without interest. Therefore, the IRS would impute 10% interest a year compounded semi-annually to each payment so that the estate would have to pay tax on that interest as ordinary income and the Arambels could deduct it as a business expense.

3. Taking the contract as of the day it was executed, it is clear that the Arambels could have waited until the last day of the full forty years of the lease and could have continued to deduct the lease payments as business expenses and the estate would have to declare them as ordinary income, thereby effectively depriving the estate of the opportunity to treat the payments as long term capital gains rather than as ordinary income.

4. The option provides that "the area or areas on which said animal units are run shall be at the discretion and control of the" Arambels if Isaac, Jr. exercises his option. He has nothing to say about it at all.

5. The option states the Arambels "shall be entitled" to buy the 500 A.U.M.'s if the option is not exercised. They are not obligated to buy them. Therefore, as I understand it, Isaac, Jr. would be sitting there with 500 A.U.M.'s with no base property to attach them to—either federal, state, fee, or grazing association land, and, as will be noted later, would probably forever remain that position.

6. The Arambels would have from five to eight years to use the 500 A.U.M.'s free of charge until Isaac exercised his option, if ever.

7. Despite the assurances by the Arambels that Isaac, Jr. would be a partner with them, that is not the case. Nowhere in the contract was that assurance ever provided for or made good.

8. The contract to be performed over a great period of time—between 40 and 52 years—probably through the lifetime of two generations—Mrs. Brooks and possibly even her children, and particularly Isaac, Jr.

9. John Arambel testified that what he told Mrs. Brooks meant nothing—that only the contract itself mattered.

10. The entire transaction was completed with inordinate haste at the principal insistence of John Arambel, the basic documents were prepared by the Arambels, and Mrs. Brooks, as nearly as I can tell, was not consulted as far as those basic documents were concerned. It also seems unusual to me that no effort was made by the Arambels to buy at a lesser price. Generally, in my experience, there is always some dickering or "horse trading" done, but not here.

11. Although five of the ultimate beneficiaries of this estate were juveniles when the contract was made, and four of them still are, no guardian was ever appointed for them and no one represented them in any way except for the feeble and probably futile attempt to protect Isaac, Jr. Furthermore, no one ever suggested that a guardian be appointed for them.

12. Mrs. Brooks had no professional advice of any kind. She discussed the matter with her children, her brother, Mrs. McCurtain and Mr. Smith. None of them knew any more than she did about the legal

effects of the contract. Mr. Smith knew the manual aspect of operating a ranch, but nothing of the legal aspects.

13. Despite the fact that Mrs. Brooks purported to understand the contract when it was signed, I am convinced that she did not have the faintest idea of its significance. The Arambels and Zebre make much of the fact that she insisted on retaining the mineral rights, indicating her understanding of the terms of the contract, but I submit that was probably something she had heard her husband say at one time or another and it stuck in her mind. I perceived her as intellectually backward and incapable of understanding. The contract was signed on August 12, a Friday, and on August 14, a Monday, Zebre took the contract to Galen West and asked him to have the contract confirmed. West was concerned because he had not been consulted and when he talked to Mrs. Brooks, he stated she was confused. Each time he talked to her he thought she was "extremely confused" about the meaning of the "lease" as she kept calling the contract. After West explained to her the magnitude of what she had done, she said she wanted out. West also explained what she should do but she never authorized him to do anything. Even after he explained the contract to her, West thought she knew something was wrong with the deal but she continued to be confused as to what she should do. West told Zebre that Mrs. Brooks wanted the contract changed, but Zebre said his clients were satisfied so if she wanted changes, she should suggest them, but she never authorized him to do anything, as noted above. Mrs. Brooks testified that West told her the contract made him sick to his stomach. She also saw two other attorneys who told her the contract was bad but she did not hire them and later saw Mr. White who finally filed his Petition in probate on November 13, 1984, approximately one year after the Arambels took possession of the ranch. Mrs. Brooks obviously had great faith in John Arambel and an honest belief that he would take care of her. Hers was a faith beyond mere friendship as I perceived it—he was, in her eyes, acting almost in a fiduciary capacity. Because of her faith in him and because of her lack of intellectual perception, I believe Mrs. Brooks was in a state of confusion for well over a year after the contract was signed, despite the fact that three attorneys had told her the contract was bad and not in the best interests of Her or the estate. her own actions in the manner in which she spent the down payment, and proceeds from the sale of the animal livestock crop and culls, and in the manner in which she let the city property deteriorate to the point of destruction is further evidence of her confused state and inability to control the estate affairs.

14. Although the contract purports to "protect" Isaac, Jr. by giving him the option of running his 500 A.U.M.'s on the ranch, it is obvious to me that he is not now, nor will he ever able to be, capable of running anything. He is a frail, sickly boy who cannot even walk straight and who appears also mentally retarded, all as a result of his many ailments and operations. It is difficult, if not impossible, for me to comprehend how anyone with any degree of perspicacity could think otherwise. Frankly, it is questionable that Isaac, Jr. will live long enough to exercise the option, and even the contract recognizes that possibility where it gives the Arambels the right to buy the 500 A.U.M.'s if Isaac, Jr. "does not attain the age of 19 years."

15. Although the Buyers insist that by virtue of Section 2-7-609, no court confirmation of the sale was necessary if a power of sale is given in the will, it is evident that confirmation was contemplated in view of the fact that Zebre asked West to get the contract confirmed and also asked how long it would take to do this.

16. Had the ranch been sold for cash, or even on an installment sale over a short period to lessen the tax aspects, and even at the value of $1,650,000.00 placed on it by the Arambels' appraiser, that money could be invested now in such a manner as to give the estate a return far greater than this contract does. Furthermore, what will be the value of a dollar 40 to 52 years in

he future if inflation continues at even the present comparatively low rate?

the future if inflation continues at even the present comparatively low rate?